Filed 4/27/22  P. v. Roque CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SAMANTHA ROQUE,<br><br>    Defendant and Appellant. | F080242<br><br>(Super. Ct. No. 18CMS0210)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Robert S. Burns, Judge.

Robert F. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Samantha Roque was convicted by jury of one count of gross vehicular manslaughter while intoxicated, in violation of Penal Code section 191.5, subdivision (a).[1] She was sentenced to the middle term of six years (§ 191.5, subd. (c)(1)) and was ordered to pay $7,500 in restitution to the California Victim Compensation Board; a $300 restitution fine under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), suspended; a $40 court operations assessment under section 1465.8, subdivision (a)(1); and a $30 court facilities fee under Government Code section 70373, subdivision (a)(1).

Defendant claims there was no substantial evidence to support the jury's finding of gross negligence; that the trial court erroneously precluded evidence related to the victim's failure to use a seatbelt; that the trial court improperly denied probation and abused its discretion in sentencing defendant to the middle term; and that the trial court violated defendant's constitutional rights by failing to conduct an ability-to-pay hearing with respect to the $370 of fines and fees imposed. For the reasons set forth below, we reject defendant's contentions and affirm the judgment.

## BACKGROUND

### I.    Prosecution's Case-in-chief

At approximately 11:30 p.m. on February 16, 2018, California Highway Patrol (CHP) officer Jonathan Yale was dispatched to the scene of a traffic accident on Highway 41 at Madison Avenue between Lemoore and Kettleman City. This specific section of Highway 41 contains two traffic lanes, one for northbound traffic and one for southbound traffic.[2] There are yellow-painted dashed lines between the lanes, and there

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The southbound lane is for traffic headed toward Kettleman City, while the northbound lane is for traffic headed toward Lemoore and Fresno.

is a curve in the road, which Yale described as neither "abrupt" nor "'natural,'" but somewhere in between.

The accident scene was dark, with no street lights. There was an overturned Toyota RAV4 on the "west" side of the highway (southbound shoulder), and a Dodge pickup truck on the "east" side (northbound shoulder) of Highway 41. Multiple witnesses and passengers were present; firefighters arrived before Yale and were performing cardiopulmonary resuscitation on a 10-year-old victim, M.M., who sustained fatal injuries. Defendant was sitting by her Dodge. The Dodge was missing its right front tire and the entire front, right of the vehicle was crushed, with the bumper displaced and the hood crumpled.

Yale first spoke with RAV4 driver, A.B. Yale then approached defendant, and Yale could smell alcohol emanating from her breath and her body; her eyes were red and watery; and she remained sitting. He asked defendant whether she had any sort of injuries or whether she needed medical assistance; defendant did not identify injuries and she had already declined medical care.

Defendant told Yale she had been driving home from a friend's house in Lemoore toward Kettleman City when she collided with the RAV4. She denied using her cell phone while driving, she was not speeding, and she was wearing her seatbelt. The RAV4 came into defendant's southbound lane of traffic, and defendant attempted to swerve to the right, but she was unable to avoid the collision. The airbags had deployed.

As they talked, Yale became concerned defendant was under the influence. She was slurring her words and she had remained sitting while they were talking. When asked whether she had been drinking, defendant admitted she had consumed a single tequila shot about four or five hours prior to the collision; but she also said she had the shot of tequila one and one-half hours before she started driving.

Yale then subjected defendant to a variety of field sobriety tests, which are used to indicate whether someone may be under the influence, all of which defendant failed.

3.

Defendant had noted prior to the tests that she had back pain issues, a wandering-eye condition, and that she was clumsy. Yale concluded defendant was possibly under the influence and offered her a preliminary alcohol screening (PAS) test. He explained she could refuse the test, but if she was arrested, she would be required to submit a blood or breath test. Defendant refused the PAS test, and Yale placed her under arrest and transported her to the hospital to test her blood-alcohol content (BAC).

On the way to the hospital, defendant and Yale had a conversation that was recorded and played for the jury at trial. Yale explained they were going to the jail, and defendant said "that's fucked up" and she "shouldn't be in jail" because she was "not fucked up drunk." Yale said they were going to the hospital, and then defendant was "definitely going to jail." Defendant responded, "What the fuck? I'm not that drunk. So I'm going to the hospital to confirm apparently that I'm that drunk?"

Yale explained to defendant that he suspected she was under the influence of alcohol, and he had offered her a PAS test at the scene, but she had declined. Defendant said she had no idea that was the purpose of the breath test at the scene, and questioned whether Yale automatically assumed that anyone who does not consent to that breath test is under the influence. Yale tried to explain defendant was mischaracterizing what he had told her, but defendant argued "[n]o, that's completely what you're saying. Because what you're saying is hey, I didn't do that test. Therefore, you feel like I'm under the influence. That's literally exactly what you said." After arguing more with Yale, defendant concluded, "[t]hat's fine. Go ahead and take the fuckin' blood test. [¶] Because you will see that I am not under the influence."

A.B. testified that at the time of the accident, she was driving her mother's RAV4 in the northbound lane. A.B.'s mother was in the right front passenger seat, and A.B.'s daughter, sister and nephew were in the backseat. She was driving and talking with her mother; the road was clear and there was little traffic. A.B. saw white lights coming toward her in her lane, and she tried to turn the RAV4 left. Despite her attempt to avoid

4.

the other vehicle, they were struck and the RAV4 flipped. A.B. lost consciousness for a while, and then she realized the car was upside down. She asked her sister if the kids were okay. Her nephew was unconscious when pulled out of the car and had blood on his mouth.

L.V., A.B.'s mother, testified she was sitting in the front passenger seat of the RAV4 at the time of the accident. Her two grandchildren and her daughter were in the backseat, and A.B. was driving. She saw a car coming into their lane, and she closed her eyes because she did not want to see what was going to happen. She was not hurt in the collision.

When Yale examined the scene, he discovered a gouge mark in the northbound lane, which he thought was caused by the Dodge since it had lost a front tire. When that happened, Yale explained the front tire scraped against the roadway. This indicated the Dodge was in the oncoming northbound lane at the time of collision, not the southbound lane. Yale explained the collision between the Dodge and the RAV4 went into a sideswipe along both vehicles' passenger sides.

CHP Officer Nathan Howard took measurements and diagrammed the collision scene. There was a gouge mark on the roadway, and there were skid marks that indicated the RAV4 had applied its brakes; no similar brake marks were found from the Dodge. He opined the collision occurred because the Dodge traveled into the oncoming northbound lane where the roadway curves, the RAV4 made an evasive maneuver to the left to avoid the collision, and the collision and the sideswiping of both vehicles' passenger sides occurred in the Dodge's original southbound lane.

An independent witness testified she was driving behind an SUV in the northbound lane just before the accident. She saw a "flurry of sparks" in the southbound lane and the Dodge coming towards her in the northbound lane.

CHP Officer Donnie Conner performed inspections of both the Dodge and the RAV4. On the Dodge, testing showed the brakes and the steering functions were intact at

5.

the time of the collision. Conner did not look at the brakes or the steering on the RAV4; he was asked to focus on the seatbelt restraint system. He determined the driver's and right front passenger's seatbelts were being used at the time of the collision, but none of the three seatbelts in the RAV4's backseat were used. The right rear seatbelt could not be buckled at all; it was possible that seatbelt was inoperable before the collision.

Criminalist Greg Masters analyzed defendant's blood draw sample and the tests indicated an average BAC of 0.189 percent. In this case, based on elimination rates, defendant's BAC would have been about 0.22 percent two hours before the blood draw. At that BAC, a person would not be able to safely operate a vehicle. For a 190-pound female who drank seven hours before this blood draw, to achieve a 0.189 percent BAC, defendant would have had to ingest about 15 to 17 ounces of 40 percent alcohol or 11 to 12, 12-ounce beers at 4.5 percent alcohol. The criminalist opined someone with a BAC of 0.189 percent would be grossly impaired.

A pathologist opined M.M.'s death was caused by blunt force trauma of the head that caused a basilar skull fracture.

## II.    Defense Case

Officer Yale was recalled by the defense and testified A.B.'s sister was seated in the left rear of the RAV4; M.M. was in the right rear seat; and the female minor was in the center rear seat. He reached out to several witnesses after the accident and prepared a traffic collision report. His report indicated defendant had told him she bumped her head during the accident. He recalled it was difficult to get answers from defendant because she was not providing complete responses; while she said she had stopped drinking five hours before the accident, she also contrarily said she had stopped drinking one and one-half to two hours before.

Defendant testified in her own defense. On the day of the accident, she had been at a family barbeque in Lemoore since around 3:00 p.m. She had food and alcohol at the party, but she was not sure when she started drinking and she could not remember how

6.

much she had to drink.  She also did not recall when she stopped drinking for the evening.  She left the party around 11:00 p.m. to go home to Kettleman City.  She felt okay when she left; she did not feel intoxicated.  She took Highway 41 for the return trip, with which she was very familiar.  She was wearing her seatbelt and she was not using a cell phone.  She did not have the radio on, and she was driving the speed limit as she always does on that road.

While she was driving, a vehicle coming the opposite direction drove into her lane; defendant pulled on the wheel, but was unable to avoid the accident.  She could not remember much after the accident, and she did not recall the impact.  She regained consciousness in the Dodge and saw the airbags had deployed and the windows were broken out.  She was confused and the next thing she remembered was being outside of the truck.

She was confused when she was talking to Yale; she may have sat down, but she could not remember.  She recalled telling Yale where she had been before the collision, and that she had been driving the speed limit.  She was unable to communicate all of the details because she did not remember all of it.  She could not recall if he asked about her injuries or medical treatment, but he asked about her alcohol consumption.  She informed him she had some alcohol, but could not remember saying how much she consumed.

She was arrested and taken to the hospital, where she had her blood drawn.  No other tests were done, but she could not remember being offered any other tests.  She was then taken to the county jail.  At some point, she learned the details of the accident.

She could not remember telling the officer she had only one shot of tequila; she could not recall if she had a single shot—it could have been one drink, it could have been 10.  She got behind the wheel knowing she had consumed alcohol, but she did not recall what she had been drinking.  She acknowledged it was possible she missed the curve in the road and that she caused the accident.  She remembered hitting the brakes, and she told the officer that.  She believed she bumped her head during the accident, but she was

7.

not hospitalized for any kind of head injury. She acknowledged she knew it was dangerous to drink and drive and that traffic collisions can result in injury or death, but she did it anyway.

### III. Prosecution Rebuttal Case

The prosecution called CHP Sergeant John Kolter, who conducted an in-depth accident investigation. From the RAV4's data, he determined that vehicle was traveling at 65.9 miles per hour 4.1 seconds before the collision; at one-tenth of a second before the crash, the RAV4's speed was down to 39.8 miles per hour. The RAV4 was operating in cruise control mode before the crash; there was no data available from the Dodge.

### IV. Verdict and Sentencing

The jury found defendant guilty of gross vehicular manslaughter while intoxicated, and she was sentenced to the middle term of six years.

### DISCUSSION

### I. Substantial Evidence of Gross Negligence

Defendant was convicted of gross vehicular manslaughter while intoxicated under section 191.5, subdivision (a). That provision states, in relevant part, "[g]ross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence." (*Ibid.*)

Defendant disputes the sufficiency of evidence of the element of gross negligence, while the People maintain there was ample evidence to support the jury's finding.

8.

## A. Standard of Review

We review this claim under the familiar substantial evidence standard of review. We are required to view the "whole record in the light most favorable to the judgment" and determine if there is "substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The "uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) As a reviewing court, we may not reweigh the evidence or consider the relative strength of contrary findings; instead, we must "presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

## B. Analysis

The California Supreme Court has explained that "[g]ross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens."' [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved." (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036 (*Bennett*); accord, *People v. Ochoa* (1993) 6 Cal.4th 1199, 1204 (*Ochoa*).)

This degree of negligence cannot be supported by the "'mere fact'" that a driver violates a traffic law while legally intoxicated—gross negligence requires something more. (*Bennett, supra*, 54 Cal.3d at p. 1036.) To determine negligence and its degree, the jury must holistically examine "all relevant circumstances, including [the] level of intoxication, to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence." (*Id.* at p. 1038.)

9.

Defendant maintains any evidence of negligence here does not rise to the level of gross negligence:  she committed no traffic violations nor was she driving erratically at the time of the accident; she had no criminal record for driving while intoxicated or any other crime; and of the five people in the RAV4, only M.M. was hurt and that was just because he was not wearing a seatbelt.  In view of this, defendant argues the jury's finding of gross negligence must rest solely on the mere fact of her intoxication, which legally is insufficient.  Defendant cites several other cases, including *Ochoa*, where courts discussed evidence of gross negligence in the context of drunk driving, and she argues the facts here are much less egregious than any of those.

In *Ochoa*, the high court found sufficient evidence of gross negligence where the defendant's BAC was as high as 0.15 percent at the time of the accident; he had exceeded the posted speed limit by at least 15 miles per hour at times; and he wove his vehicle in and out of adjoining lanes abruptly, without signaling, and without braking to avoid colliding with the vehicle carrying the victims who were killed as a result.  (*Ochoa, supra*, 6 Cal.4th at pp. 1202–1203.)  The defendant had prior convictions for driving under the influence of alcohol and was fully aware of the associated risks.  (*Id.* at p. 1203.)

In *People v. Von Staden* (1987) 195 Cal.App.3d 1423 (*Von Staden*), the court concluded there was ample evidence of gross negligence, including that the defendant ignored his host's urging that he not drive while intoxicated; his BAC was 0.22 percent at the time of the accident; and he drove 30 miles per hour over the speed limit on a dark, foggy night on a curved road.  (*Id.* at pp. 1426, 1428.)

In *Bennett*, the defendant was seen weaving in and out of traffic lanes; he crossed a double yellow centerline and passed three cars; he was driving about 10 miles over the speed limit when he lost control of the vehicle and crashed, killing one of his passengers; and two hours after the accident, his BAC tested at 0.20 percent.  (*Bennett, supra*, 54 Cal.3d at pp. 1034–1035.)  Our high court held the trial court did not err by instructing

the jury it was to consider the overall circumstances of the defendant's intoxication or the manner in which he drove, or both, to determine whether the defendant's conduct constituted gross negligence. (*Id.* at p. 1038.) The court cited *Von Staden* with approval and observed that a driver's level of intoxication is an integral aspect of the driving conduct the jury may consider in determining gross negligence. (*Bennett, supra*, at p. 1038.)

Finally, in *People v. Hansen* (1992) 10 Cal.App.4th 1065, the defendant drove erratically on a winding mountain road, entering the oncoming lane of traffic and speeding as he negotiated the curves; refused his passengers' pleas to slow down or pull over; and ultimately drove over a cliff, killing one of the passengers. (*Id.* at pp. 1068–1070.) The defendant's BAC measured 0.20 percent. (*Id.* at p. 1070.) The chief issue on appeal was whether the trial court erred in permitting the prosecution to argue a theory of liability under section 191.5 based in part on the defendant's failure to ensure his passengers were seatbelted. (*Id.* at pp. 1072–1073.) In concluding the trial court had not erred, the court noted "gross negligence was clearly evidenced in this case" even if the defendant had been driving flawlessly because he failed to heed requests from his passengers to slow down, failed to ensure they used seatbelts, and ignored one passenger's express request for help finding a seatbelt. (*Id.* at p. 1078.)

While the facts of these cases might include more egregious driving conduct as defendant claims, a factual comparison of other cases is not especially helpful when reviewing for substantial evidence. (See *People v. Thomas* (1992) 2 Cal.4th 489, 516 ["When we decide issues of sufficiency of the evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."].) Moreover, none of these cases purports to encapsulate a minimum evidentiary showing of gross negligence.

Here, expert testimony established defendant's BAC was more than two times the legal limit: she tested at 0.189 percent two hours after the accident; and the criminalist

opined defendant's BAC would have been approximately 0.22 percent at the time of the accident. Gross negligence can be shown by the level of the defendant's intoxication: "one who drives with a very high level of intoxication is indeed more negligent, more dangerous, and thus more culpable than one who drives near the legal limit of intoxication, just as one who exceeds the speed limit by 50 miles per hour exhibits greater negligence than one who exceeds the speed limit by 5 miles per hour." (*Von Staden, supra*, 195 Cal.App.3d at p. 1428.) A reasonable jury could conclude this was an excessive BAC level and led to defendant driving her vehicle in the opposing lane of traffic, despite oncoming cars. (*Bennett, supra*, 54 Cal.3d at p. 1038 [level of intoxication is "integral aspect" of the driving conduct relevant to whether the defendant acted with conscious disregard of the consequences rather than with mere indifference].)

The criminalist also testified that a woman of defendant's proportions would not register a 0.22 or a 0.189 percent BAC after only one shot of tequila as defendant told the officer was the limit of her alcohol intake prior to the accident. The criminalist opined it would have taken about 15 to 17 ounces of a 40 percent alcoholic beverage for defendant to obtain BAC levels of 0.189 percent or more; and a person at 0.189 percent BAC would be grossly impaired and unsafe to operate a vehicle. A reasonable jury could infer from this evidence that defendant knew she was highly intoxicated when she decided to drive because of how much alcohol she would have had to ingest to reach such a high BAC level. Defendant also acknowledged during cross-examination that she knew it was dangerous to drink and drive, but still made the decision to do so. (See *Ochoa, supra*, 6 Cal.4th at p. 1208 [trier of fact could conclude from the defendant's course of conduct and preexisting knowledge of the risks that he exercised so slight a degree of care as to exhibit conscious indifference concerning ultimate consequences of actions].)

The jury also knew defendant's route home was a 30-minute highway drive, which she undertook at night. A reasonable jury could conclude that taking this drive exhibited a conscious indifference to the consequences: longer driving distances on well-traveled

12.

roadways increase the likelihood of encountering other vehicles or obstacles (e.g., animals or debris) that require higher levels of focus and attention, especially at night; and highway driving is associated with higher speed limits—here, the jury knew the speed limit was 55 miles per hour. Accidents on a highway, as opposed to surface streets, are almost certainly going to involve greater vehicle speeds, increasing the chances of injury. When defendant veered into the oncoming lane of traffic on Highway 41, these additional risks defendant knowingly undertook set the stage for exactly the type of tragic accident that occurred—seconds before the accident, both vehicles were traveling at more than 50 miles per hour, and when A.B. tried to avoid the vehicle in her lane, she was unable to do so, and the RAV4 flipped over, killing one of the passengers.[3]

In sum, there was substantial evidence from which a reasonable jury could infer and find defendant ingested a large amount of alcohol and became highly intoxicated; reasonably knew she was highly intoxicated; and, despite knowing the risks of driving drunk, decided to drive 30 minutes home on a dark highway late at night, veered into oncoming traffic, and caused an accident that killed a passenger in an oncoming vehicle. This evidence was sufficient to support the jury's finding defendant's conduct rose above simple negligence and constituted gross negligence.

## II. Exclusion of Seatbelt Evidence

Defendant argues the trial court erred in excluding the evidence that M.M. was not wearing a seatbelt at the time of the accident.

### A. Background

At the preliminary hearing in September 2018, Officer Yale testified that when he spoke to L.V. on the night of the accident, she did not report any defect with a seatbelt in

---

[3] While there was a factual dispute whether defendant's vehicle was the first to enter the oncoming lane, the jury was entitled to, and necessarily did, resolve this factual dispute against defendant.

13.

her RAV4. When he followed up with her after the accident, she told him she had taken the vehicle to the dealership before the collision to have the seatbelts inspected and she had scheduled an appointment for the day after the collision to have one of the belts replaced. A.B. denied any knowledge of a seatbelt defect when interviewed after the accident. M.M.'s mother, E.A., reported to a different officer that she and her niece had been wearing seatbelts during the accident. Another witness who Yale interviewed said M.M. had not been buckled in when she found him and pulled him out of the vehicle.

On September 5, 2019, both parties filed motions in limine. Defendant sought to admit evidence that M.M. was not wearing his seatbelt as relevant to establish the totality of the circumstances of the accident, defendant's degree of negligence, and as to the proximate cause of M.M.'s death; the prosecution sought to exclude this evidence as irrelevant.

At the hearing, defense counsel argued the seatbelt evidence was relevant "[j]ust to the totality because the facts are in dispute, and then whose—whose conduct caused the accident." The court explained it had reviewed authority holding the seatbelt status of a victim who is not in the defendant's vehicle is not relevant because it is not part of the causation analysis; the court ruled tentatively that the seatbelt evidence was not relevant, but informed the parties that if "something pops up where you think it becomes relevant we can revisit that."

At trial, after L.V. and A.B. had testified and were excused, the People called Officer Conner, who testified that none of the seatbelts in the rear of the RAV4 were in use at the time of the collision, and the right rear passenger seatbelt where M.M. had been sitting was retracted and locked into place. Conner testified it was possible that seatbelt was inoperable before the collision.

Defendant argues the trial court erred in excluding the seatbelt evidence because it was relevant to causation, defendant's degree of gross negligence, and for impeachment and credibility purposes. Further, the trial court's error in excluding this evidence also

violated defendant's constitutional rights to present a complete defense and confront witnesses. The People contend the seatbelt evidence was irrelevant and there was no abuse of discretion in excluding it. Moreover, even if there was error, the People argue it was harmless because the evidence was nonetheless admitted through Conner's cross-examination.

### B.      Standard of Review

Relevant evidence includes all "evidence … having any tendency in reason to prove … any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  A trial court's decision to exclude evidence as irrelevant is reviewed on appeal for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 205–206.)  The trial court "'has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence.'" (*People v. Riggs* (2008) 44 Cal.4th 248, 289.)

### C.      Seatbelt Evidence Not Relevant to Causation

According to defendant, M.M.'s death was proximately caused by M.M.'s lack of a seatbelt, and M.M.'s mother's failure to ensure he was wearing a seatbelt was a violation of Vehicle Code section 27360.5.[4]  Defendant argues M.M.'s mother's criminal act in failing to ensure M.M. used a seatbelt and his unrestrained status were relevant as an intervening, superseding cause of M.M.'s death that should have been admitted as causation evidence.

---

[4]      Enacted in 2011 and effective January 1, 2012, Vehicle Code section 27360.5 provides as follows: "(a) A parent, legal guardian, or driver shall not transport on a highway in a motor vehicle … a child or ward who is eight years of age or older, but less than 16 years of age, without properly securing that child or ward in an appropriate child passenger restraint system or safety belt meeting applicable federal motor vehicle safety standards. [¶]  (b) Subdivision (a) does not apply to a driver if the parent or legal guardian of the child is also present in the motor vehicle and is not the driver."  Violation of this section is punishable by fines of $100 for a first offense and $250 for subsequent offenses. (*Id.*, § 27360.6, subds. (a)(1), (b)(1).)

Causation was among the essential elements of the charge of gross vehicular manslaughter while intoxicated—i.e., whether defendant's grossly negligent conduct caused the death of another person. (See CALCRIM No. 590.) The actual, direct cause of death in this case was the blunt force trauma to M.M.'s head, as the pathologist testified. As such, it is proximate causation, not direct or actual causation, which, together with the requisite mens rea, determines defendant's criminal liability. (*People v. Sanchez* (2001) 26 Cal.4th 834, 845.) To determine whether defendant proximately caused M.M.'s death, the jury was instructed that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act." (CALCRIM No. 590; see *People v. Schmies* (1996) 44 Cal.App.4th 38, 48 (*Schmies*) ["'[F]or liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act.'"].)

"In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.'" (*Schmies, supra*, 44 Cal.App.4th at pp. 48–49.) There may be more than one proximate cause of death (*People v. Sanchez, supra*, 26 Cal.4th at p. 847), but it is well established that the contributing negligence of a victim is not sufficient to absolve the defendant of criminal liability unless that negligence is an intervening force that constitutes a superseding cause. (*People v. Cervantes* (2001) 26 Cal.4th 860, 866–867 [the defendant may be criminally liable for a result directly caused by his or her act even though there is another contributing cause]; *People v. Marlin* (2004) 124 Cal.App.4th 559, 569 [crime victim's contributory negligence is not a defense]; *People v. Autry* (1995) 37 Cal.App.4th 351, 360 [contributing negligence of victim does not relieve criminal actor's liability unless victim's conduct was sole or superseding cause of death] (*Autry*).)

Here, the question presented is whether M.M.'s failure to wear a seatbelt was an intervening force that constituted a superseding cause of his death, breaking the chain of

causation arising from defendant's act of driving while intoxicated, straying into the oncoming traffic lane, and causing the accident that led to M.M.'s fatal head injury. The Restatement Second of Torts, section 441, subdivision (1), states, "An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." (See *Schmies, supra*, 44 Cal.App.4th at pp. 46–47 [principles of causation apply to crimes as well as civil torts]; *People v. Sanchez, supra*, 26 Cal.4th at p. 855 [criminal law relies on civil law formulations of concurrent and superseding cause].)

A superseding cause refers to an intervening force that breaks the chain of causation, "'producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible.'" (*People v. Sanchez, supra*, 26 Cal.4th at p. 855 (conc. opn. of Kennard, J.); *People v. Cervantes, supra*, 26 Cal.4th at p. 871 [superseding cause is an *independent* intervening force].) On the other hand, if the intervening force or cause ""'is a normal and reasonably foreseeable result of [the] defendant's original act,'"" the intervening force is dependent and not a superseding cause, and it will not relieve a defendant of liability. (*People v. Cervantes, supra*, at p. 871.)

Relying on these principles, two Courts of Appeal have concluded victims' lack of safety equipment to protect them against the harm caused by a drunk driver was not an intervening force as a matter of law and could not constitute a superseding cause to relieve the respective defendants of criminal liability. (*Autry, supra*, 37 Cal.App.4th at p. 360; *People v. Wattier* (1996) 51 Cal.App.4th 948 (*Wattier*).) In *Autry*, the defendant drove recklessly with a 0.22 percent BAC and ultimately plowed into and killed two highway construction workers. (*Autry, supra*, at pp. 355–357.) Upon trial, the defendant was convicted of two counts of second degree murder and two counts of driving with a BAC of 0.08 percent or more, causing bodily injury. (*Id*. at p. 355.)

17.

On appeal, the defendant argued the trial court erred in refusing to give an intervening or superseding cause instruction to the jury. (*Autry, supra*, 37 Cal.App.4th at p. 360.) The defendant had argued to the jury the construction company should have used an "attenuator truck" to protect its workers.[5] (*Autry, supra*, at p. 357.) In rejecting this argument, the Court of Appeal pointed out the defendant's requested instructions correctly stated that an intervening force that constitutes a superseding cause is one which relieves the criminal actor of responsibility and breaks the chain of cause *after* the defendant's original act; the lack of an attenuator truck preexisted the defendant's conduct. (*Id.* at p. 361.)

Moreover, the court observed the failure to provide an attenuator truck was the *absence* of an intervening force that *failed* to break the chain of the natural and probable consequences of the defendant's conduct and, as such, could not be an intervening, superseding cause as a matter of law. The court applied the reasoning employed in *People v. McGee* (1947) 31 Cal.2d 229, where the high court concluded that a surgical delay after a shooting did not constitute an intervening force to relieve the defendant of criminal liability for the shooting victim's death. (*Autrey, supra*, 37 Cal.App.4th at p. 361, citing & quoting *People v. McGee, supra,* at p. 243.) The high court explained the "defendant cannot complain because no force intervened to save him from the natural consequence of his criminal act. The factual situation is in legal effect the same, whether the victim of a wound bleeds to death because surgical attention is not available or because, although available, it is delayed by reason of the surgeon's gross neglect or incompetence. The delay in treatment is not in fact an intervening force; it cannot in law amount to a supervening cause." (*People v. McGee, supra*, at p. 243.) The *Autry* court

---

[5]    The defendant presented evidence that California Department of Transportation policy requires that an "'attenuator truck'" follow behind roadway workers to absorb any collision if a vehicle veers into an area where workers are located; the victims' construction company did not have such equipment. (*Autry, supra*, 37 Cal.App.4th at p. 357.)

reasoned that similar to *McGee*, the defendant could not complain that a third party failed to take steps (providing an attenuator truck), which might have prevented the natural and probable consequences of the defendant's conduct. (*Autry, supra*, at p. 361.)

In *Wattier*, the defendant was speeding and darting between traffic without signaling and tailgating other motorists. (*Wattier, supra*, 51 Cal.App.4th. at p. 951.) After attempting to pass a vehicle on the right shoulder, the defendant's vehicle lost traction and careened into another vehicle that, in turn, whirled out of control and overturned. (*Ibid.*) An eight-year-old front passenger in that vehicle died of massive internal injuries; meanwhile, the defendant drove off without even slowing down. (*Ibid.*) The defendant was charged with vehicular manslaughter.

The prosecution sought to exclude any mention at trial that the little boy was not wearing a seatbelt at the time of the collision. (*Wattier, supra*, 51 Cal.App.4th at p. 952.) The defense objected and argued that if the victim had been properly belted, no death would have occurred. (*Ibid.*) The trial court ruled the seatbelt evidence was inadmissible, and the appellate court agreed. (*Id.* at pp. 952, 953.)

Relying on *Autry*, the court similarly reasoned that an intervening force is one occurring *after* the defendant's act; moreover, the lack of a seatbelt was the *absence* of a force that failed to break the chain of the natural and probable consequences of the defendant's conduct. (*Wattier, supra*, 51 Cal.App.4th at p. 953.) As a matter of law, the failure to wear a seatbelt was not an intervening force and, thus, could not constitute a superseding cause of the victim's death. (*Ibid.*) As such, the court held the seatbelt evidence was irrelevant to the ultimate issue of the defendant's criminal responsibility and concluded the evidence was properly excluded. (*Id.* at p. 955.)

We find the causation principles applied in *Autry* and *Wattier* operate equally here. As explained in both *Autry* and *Wattier*, a victim's (or a victim's employer's) preexisting failure to take particular protective actions is not an intervening force as a matter of law. (*Autry, supra*, 37 Cal.App.4th at p. 361; *Wattier, supra*, 51 Cal.App.4th at p. 953.) Both

19.

courts emphasized that third parties' and/or the victims' failure to take certain protective/preventative action *preexisted* the defendants' conduct, which precluded that omission from being an intervening force. (*Autry, supra*, 37 Cal.App.4th at p. 361 ["an 'intervening' or 'superseding' cause which relieves the criminal actor of responsibility is one which 'breaks the chain of causation' *after* the defendant's *original* act"]; *Wattier, supra*, 51 Cal.App.4th at p. 953 ["a superseding cause must break the chain of causation *after* the defendant's act before he or she is relieved of criminal liability for the resulting harm"].)

Neither court noted comment a. to subdivision (1) of section 441 of the Restatement Second of Torts, which states that "[a] force set in motion at an earlier time is an intervening force if it first operates after the actor has lost control of the situation and the actor neither knew nor should have known of its existence at the time of his negligent conduct." However, even if comment a. to section 441, subdivision (1) of the Restatement Second of Torts means that the *preexisting* lack of a seatbelt here did not dispositively preclude it from constituting an intervening force, both courts relied on the separate fact that the absence of an attenuator truck and seatbelt were not forces at all: their absence as safety measures constituted the *lack* of a force that *failed* to break the chain of causation. (*Autry, supra*, 37 Cal.App.4th at p. 361; *Wattier, supra*, 51 Cal.App.4th at p. 953.) The same holds true here. As *Autry* pointed out, this is analogous to the surgical delay in *McGee* that the Supreme Court held could not constitute an intervening force constituting a superseding cause as a matter of law. (*Autry, supra*, at p. 361, citing & quoting *People v. McGee, supra*, 31 Cal.2d at p. 243.)

Defendant contends *Autry* is too far removed from the facts of this case to have any analogous value because in *Autry* the defendant was able to admit evidence that the victims' employer failed to protect its highway workers with an attenuator truck. Yet, the admission of this evidence in *Autry* does not affect the analysis. The appellate court pointed out the lack of an attenuator truck was evidence only of a concurrent cause that

20.

did not warrant a superseding cause instruction; and there was no evidence the accident and resulting deaths were caused solely by the lack of a protective attenuator truck. (*Autry, supra*, 37 Cal.App.4th at pp. 361–362 [distinguishing *People v. Glass* (1968) 266 Cal.App.2d 222, where road repair crew's lack of safety precautions was relevant as the sole cause of a traffic accident and resulting death].) Similarly, here, there was no evidence the accident and resulting death was caused solely by M.M. being unbuckled. The lack of a seatbelt was not an intervening force as a matter of law—it was the absence of a force that failed to break the chain of causation and, thus, it could not constitute a superseding cause that would alleviate defendant's criminal liability.

Defendant also argues *Wattier*'s reasoning as to seatbelts should not control here because the accident in that case occurred in 1993, and it was not decided on appeal until 1997 when seatbelt use was not as widespread as it is now. Defendant maintains that by 2018, when the accident occurred here, it would have been unlikely that M.M. would not be wearing a seatbelt, especially since his mother's failure to ensure he was buckled was a criminal act.

This argument, however, presupposes M.M.'s failure to be seatbelted constituted an intervening force and fails to confront the causation principles relied on by *Autry* and *Wattier*. The subsequent factual question of whether an intervening force was so unforeseeable and extraordinary that it constitutes a superseding cause, which is defendant's argument, is moot when there is no intervening force as a matter of law.

For the same reasons, the breach of M.M.'s mother's legal duty to ensure M.M. was seatbelted did not constitute an intervening, superseding cause. (*Autry, supra*, 37 Cal.App.4th at p. 360 ["contributory negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the *sole* or *superseding* cause of the death"].) Additionally, as explained in the Restatement Second of Torts, section 452, subdivision (1), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding

cause of such harm. Comment b. on subdivision (1) explains that "[i]f the third person is under a duty to the other to take such action, his failure to do so will subject him to liability for his own negligence, which is concurrent with that of the actor, for the resulting harm which he has failed to prevent; but his failure to perform his duty does not relieve the original actor of liability for the results of his own negligence." (Rest. 2d Torts, § 452, subd. (1), com. b.)

This reasoning is underpinned by the public policy considerations that *Wattier* touched upon: "A society cannot permit a defendant to escape responsibility for his or her criminal conduct simply because a victim [or a third party] was not 'sufficiently' cautious or perfect." (*Wattier, supra*, 51 Cal.App.4th at p. 954.) M.M's mother had a legal obligation to properly seatbelt her child under Vehicle Code section 27360.5 to mitigate the potential danger that vehicle travel poses—sometimes created by willful, criminal and/or reckless acts of other drivers, and other times stemming from things like drivers navigating sudden obstacles in the roadway, vehicle mechanical failures, inattention, misjudgment, and bad weather, to name just a few. M.M.'s mother is responsible for her own conduct, which may have contributed to M.M.'s death, but her contributory negligence does not negate defendant's criminal liability for proximately causing M.M.'s death.

For the reasons articulated in *Autry*, *Wattier*, and *McGee*, M.M.'s lack of a seatbelt here was not a force at all, but the absence of a force that *failed* to break the chain of causation—it was not an intervening, superseding cause as a matter of law. As such, it was not evidence that could relieve defendant of criminal liability for proximately causing M.M.'s death, and it was irrelevant to the ultimate issue of defendant's criminal responsibility. The trial court did not err by excluding the seatbelt evidence as irrelevant to the issue of causation.

22.

### D. Other Relevance of Seatbelt Evidence

Defendant additionally argues the seatbelt evidence was relevant to the jury's consideration of whether her conduct was grossly negligent. We disagree. Gross negligence is determined from the overall circumstances "'*of the defendant's conduct resulting in the fatal accident.*'" (*Bennett, supra*, 54 Cal.3d at p. 1039, italics added, fn. omitted.) This includes the level of defendant's intoxication, the manner of driving, and anything else relevant to defendant's conduct resulting in the fatal accident. In *People v. Hansen*, the victim's seatbelt status was relevant because the victim was a passenger in the defendant's vehicle, and the defendant had a legal obligation to ensure passengers had operable seatbelts that were buckled. (*People v. Hansen, supra,* 10 Cal.App.4th at pp. 1068, 1077–1078.) Outside that particular context, we are aware of no authority, and defendant cites none, that a victim's seatbelt status is relevant to the degree or the existence of the defendant's gross negligence.

Finally, defendant maintains she should have been able to explore the seatbelt evidence as relevant to A.B.'s credibility—both as a matter of state evidentiary law and under her right to present a complete defense and confront witnesses under the federal Constitution. Defendant contends L.V. told officers she was aware of a preexisting defect in M.M.'s seatbelt, yet A.B. told police everyone in the backseat was buckled. Defendant argues she should have been able to explore A.B.'s preexisting knowledge of the seatbelt defect as relevant to her overall credibility, which was important because A.B. testified defendant came into her lane of traffic. By the time the prosecutor's expert testified that none of the seatbelts in the rear of the victim's vehicle were in use at the time of the accident—opening the door for cross-examination on the seatbelt testimony— A.B. and L.V. had already testified. Thus, although evidence of M.M.'s lack of a seatbelt was ultimately admitted, it came too late for defendant to use it to explore A.B.'s credibility.

23.

Defendant, however, never presented this theory of relevance to the trial court and may not predicate error on a theory that was not presented below. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1179 [the defendant failed to preserve relevance issue for appellate review where he failed to explain relevance of evidence or otherwise establish its admissibility at trial]; see also *People v. Casares* (2016) 62 Cal.4th 808, 830 [failure at trial to advance other basis of relevance beyond credibility forfeited argument on appeal], disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

At the motion in limine hearing, the trial court left open the possibility that proceedings at trial might render seatbelt evidence relevant and expressly indicated the ruling could be revisited. Defendant never argued at the hearing or in her motion in limine that L.V.'s preexisting knowledge of the seatbelt defect and A.B.'s statement to police that everyone was seatbelted could be relevant to A.B.'s or L.V.'s general credibility.[6] Defendant also did not seek to elicit testimony about A.B.'s or L.V.'s knowledge of RAV4 seatbelt defects for credibility purposes when they testified. Moreover, the record does not reflect any objection or request to recall A.B. and L.V. for further cross-examination on this basis after the prosecution's expert testified about his investigation of the RAV4's seatbelts. (See *People v. Flynn* (1958) 166 Cal.App.2d 501, 511 [recalling of a witness excused by all parties for further cross-examination is a matter committed to sound discretion of court]; see also Evid. Code, § 774 [court has discretion to permit reexamination of a witness].)

Having concluded the court did not abuse its discretion by ruling the seatbelt evidence was irrelevant to issues of causation and the gross negligence of defendant, we also reject defendant's claim that the exclusion of this evidence violated her various rights under the federal Constitution. (*People v. Prince* (2007) 40 Cal.4th 1179, 1243

---

**6** In other words, defendant argues she should have been able to explore whether A.B. knew M.M.'s seatbelt was inoperable and, thus, lied to the police when she told them everyone was belted at the time of the accident.

[rejecting the defendant's claims "'that the trial court's exclusion of the proffered evidence violated his federal constitutional rights to present a defense, to confront and cross-examine witnesses, and to receive a reliable determination on the charged … offense [because] [t]here was no error under state law, and we have long observed that, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense"'"].)

## III. Trial Court's Sentencing Choices

Defendant argues the trial court abused its discretion in denying probation and imposing the six-year middle term.

### A. Background

A probation officer interviewed defendant and noted defendant appeared to be genuinely remorseful and took full responsibility for her actions. Defendant told the officer she did not have a prior record and was not a regular drinker. The officer noted defendant was intoxicated at twice the legal limit during the accident, she had caused the death of one victim and emotional trauma to the other victims, but she had no prior record.

The probation officer recommended that probation be denied: "Although the defendant does not have a prior criminal history, the present matter before the Court is an example of negligence on the defendant's part which caused the death of a 10-year-old boy which could have been prevented. However, most concerning is the fact that the defendant's [BAC] was extremely high and, although she told the investigating officer on the scene that she only had '*a shot of tequila*,' it does not coincide with the defendant's driving pattern, coupled with the fact that she performed extremely poor on her field sobriety tests. [¶] The communities all around this nation have heard countless reports of deaths caused by drunk drivers; therefore, there is no excuse when someone gets behind the wheel intoxicated. This is especially true in the defendant's case, where she was planning to drive an approximate 30-minute drive from Lemoore to Kettleman City.

Therefore, this officer is respectfully recommending the defendant be denied a grant of probation. After reviewing all the circumstances in this matter, as well as the aggravating and mitigating factors, this officer finds it appropriate to recommend the middle term of six years state prison."

Defendant filed a sentencing brief seeking a grant of probation. Defendant noted she had been incarcerated for nearly a year and a half without incident; she was granted a two-day release to attend her grandfather's funeral and she complied with all orders during her release and returned to jail as required. Defendant emphasized her lack of any criminal history; her belief the circumstances of her offense were much less serious than those typically presented for convictions under section 191.5, subdivision (a); and that justice would be best served by granting probation.

In denying probation and imposing the middle term of six years, the court indicated as follows:

> "I would note that [defendant] was convicted of a violation of … section 191.5[, subdivision (a)], gross vehicular manslaughter while intoxicated. It occurred when she was driving on a highway that had an S curve. She drove through the S curve into the oncoming flow of traffic hitting the side of the victim's vehicle causing the victim's vehicle to roll over and off the roadway.
>
> "The one passenger in that vehicle was [M.M.], who was ten years old, and he was killed as a result of the accident. And the defendant's [BAC] at the time was a—it was a .18, .19. That was the evidence during the tr[ia]l.
>
> "In looking at a grant of probation the defendant was an active participant. She did inflict physical injury and emotional injury. The injury to [M.M.] was an element of the offense, and that's not what I'm referring to, but there does appear to be both physical injury to the other participants and clearly emotional trauma as a result of the accident and the injury that [defendant] caused.
>
> "Her prior criminal record consists solely of one prior speeding ticket. Other than that she has absolutely no history with the justice system. She has indicated a willingness to comply with probation and probation

26.

terms and she should be able to comply with those terms and conditions of probation.  She would suffer the same effects and collateral consequences all defendants encounter when they've been convicted of a felony and incarcerated on a felony.

"Probation indicates that they believe [defendant] is remorseful; however, that appears to me to be in contrast to her trial testimony and the video of her contact with the police officer during the incident, both of which appear to me to demonstrate a marked lack of remorse.  The defendant does appear to me to be a danger to others if not imprisoned.  At this time the Court will deny a grant of probation.

"In terms of looking at the appropriate period of incarceration, she has absolutely no prior criminal record.  In comparing this with other instances of the same crime really the aggravating factor is the fact that [M.M.] was only ten years old, and it's the tender age of [M.M.] that I find to be rather aggravating.  The loss to society is greater when a child is killed in such a needless and senseless fashion, and when not necessarily an adult, we lose not only a member of society, we lose a future.  And the pain that is suffered by the surviving family members is greater because of that innocence that's lost when a child is killed.

"Based upon all that I do think the absence of a record is a pretty significant mitigating factor.  It appears to me that the middle term of six years as recommended by Probation is the appropriate term."

## B.      Denial of Probation Was Not Abuse of Discretion

### 1.      Standard of Review

"Probation is an act of clemency which rests within the discretion of the trial court, whose order granting or denying probation will not be disturbed on appeal unless there has been an abuse of discretion." (*People v. Henderson* (1964) 226 Cal.App.2d 160, 163.)  The defendant bears a heavy burden when attempting to show an abuse of that discretion.  (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311, disapproved on other grounds by *People v. Cook* (2015) 60 Cal.4th 922, 938–939.)  In reviewing the trial court's order for an abuse of discretion, the appellate court's function is to determine whether that order is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.  (*Weaver, supra*, at p. 1311.)  The circumstances utilized

by the trial court to support its sentencing choice must be established by a preponderance of evidence, and a reviewing court considers whether there was substantial evidence to support the trial court's finding that a particular factor is applicable. (*Id.* at p. 1313.)

## 2. Relevant Criteria in Considering Probation

The California Rules of Court provide nonexhaustive criteria for the trial court to consider in granting or denying probation.[7] These criteria include facts relating to the crime: (1) the nature, seriousness, and circumstances of the crime as compared to other instances of the same crime; (2) whether the defendant was armed with or used a weapon; (3) the vulnerability of the victim; (4) whether the defendant inflicted physical or emotional injury; (5) the degree of monetary loss to the victim; (6) whether the defendant was an active or passive participant; (7) whether the crime was committed because of an unusual circumstance, such as great provocation, which is unlikely to recur; (8) whether the manner in which the crime was carried out demonstrated criminal sophistication or professionalism by the defendant; and (9) whether the defendant took advantage of a position of trust or confidence to commit the crime. (Rule 4.414(a).)

Other criteria relating to the defendant include: (1) the prior record of criminal conduct of the defendant; (2) prior performance and present status on probation, mandatory supervision, postrelease community supervision, or parole; (3) willingness to comply with the terms of probation; (4) ability to comply with reasonable terms of probation as indicated by the defendant's age, education, health, mental faculties, history of substance abuse, family background and ties, employment and military service, and other relevant factors; (5) the likely effect of imprisonment on the defendant and his or her dependents; (6) the adverse collateral consequences on the defendant's life resulting from the felony conviction; (7) whether the defendant is remorseful; and (8) the

---

[7] Further references to rules are to the California Rules of Court.

likelihood that the defendant will be a danger to others if not incarcerated. (Rule 4.414(b).)

The trial court may also consider additional criteria not listed in the rules, provided those criteria are reasonably related to that decision and they are stated on the record by the sentencing judge. (Rule 4.408(a).)

### 3. Analysis

Defendant argues she was precisely the type of defendant who should have been granted probation, as she posed minimal risk to public safety and it would promote her rehabilitation. Defendant maintains the circumstances of the crime were not egregious and M.M.'s harm was partially caused by the adults in his vehicle who failed to ensure he was wearing a seatbelt; she had no prior record; she had already served over 600 days in jail prior to sentencing; and incarceration would adversely impact her daughter. Defendant further contends the probation officer and the trial court's belief that defendant posed a danger to the public was conjecture. She had no prior convictions or infractions involving alcohol, and she was driving the speed limit at the time of the accident: the incident was an aberration.

The People maintain that while there were factors that could have supported probation, there were other relevant factors that supported the trial court's decision to deny probation. The People highlight that defendant was driving with a BAC more than twice the legal limit, which would have taken 15 to 17 ounces of hard alcohol to achieve; she demonstrated objective signs of intoxication and performed poorly on all field sobriety tests; she was combative and belligerent with the investigating officer; and there was no evidence she ever inquired about anyone's safety at the scene of the accident. Though the probation officer found defendant remorseful, the court had an opportunity to consider defendant's testimony and demeanor while testifying and during the trial, and found her to be unremorseful. The trial court also noted defendant was an active participant in the crime, which had an emotional impact on the victim's family.

We find no abuse of discretion in denying probation. The court expressly considered the relevant factors that were supported by substantial evidence, and the court gave serious consideration to the request for probation, weighing the circumstances for and against it. As the People note, the factual disputes about whether defendant's conduct constituted gross negligence and whether defendant crossed into the oncoming lane of traffic were necessarily resolved against defendant by the jury's guilty verdict. While defendant's driving conduct was not as egregious as some other cases involving the same crime, it was quite serious: defendant made the decision to drive at a BAC more than two times the legal limit a substantial distance on a highway at night; she was an active participant in the crime. The court was entitled to consider these circumstances. (Rule 4.414(a)(1).)

The harm to the victim's family was also a factor the court considered—that defendant imposed significant emotional injury on those in the vehicle and the victim's family. (Rule 4.414(a)(4).) The court found defendant's demeanor and testimony at trial demonstrated a lack of remorse—another relevant factor the court was entitled to consider. Moreover, because the court found defendant demonstrated a lack of remorse at trial and in the recorded interaction with the officer just after the accident, the court had concerns defendant posed a danger if not imprisoned—that was a legitimate factor to consider and was not speculative in light of the lack-of-remorse finding—someone not demonstrating remorse may be more inclined to recidivate. (*Id.*, (b)(8).)

While there were factors that favored granting probation, we decline defendant's invitation to substitute our judgment for that of the trial court. (See *Gonzales v. Nork* (1978) 20 Cal.3d 500, 507 ["As with all actions by a trial court within the exercise of its discretion, as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below as to the propriety of its action.'"].)

30.

### C. Imposition of Middle Term

Defendant claims the trial court erred in selecting the six-year middle term (§ 1170, subd. (b)).

#### 1. Applicable Legal Standards

Pursuant to section 1170, subdivision (b)(1), effective January 1, 2022, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."[8] "[T]he court may consider the record in the case, the probation officer's report, other reports, … and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing." (§ 1170, subd. (b)(4).) The court is to set forth on the record the facts and reasons for choosing the sentence imposed. (*Id.*, subd. (b)(5).)

"'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in "qualitative as well as quantitative terms"[citation] .…'" (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) We review a trial court's sentencing selection of one of the three terms under section 1170, subdivision (b), for an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) "'"[T]he trial court is presumed to have acted to achieve legitimate sentencing objectives"'" (*People v. King* (2010) 183 Cal.App.4th 1281, 1323), and the reviewing court does not reweigh the sentencing court's balancing of factors (*People v. Scott* (1994) 9 Cal.4th 331, 355). The burden is on the party attacking the

---

[8]      At the time of sentencing in October 2019, section 1170, former subdivision (b), left "the choice of the appropriate term … within the sound discretion of the court."

sentence to clearly show the sentencing decision was irrational and arbitrary. (*People v. Carmony, supra*, at p. 376.)

### 2. No Abuse of Discretion

Defendant argues the court improperly considered M.M.'s death an aggravating factor because the victim's death is already an element of the crime, the victim's age was improperly considered since defendant did not specifically select her victim, and the court failed to properly consider the unusual mitigating circumstance that M.M.'s mother was a contributing cause of M.M.'s death.

A fact that is an element of a crime upon which sentence is imposed may not be used to impose a particular term. (Rule 4.420(h).) Defendant claims the death of the victim is a necessary element of gross vehicular manslaughter while intoxicated and this fact cannot be considered as a basis to impose a greater sentence. Examining the court's discussion of the sentencing factors, however, it was not M.M.'s death the court considered an aggravating factor, but M.M.'s young age. The trial court ruled that although defendant had no prior criminal history, which was a mitigating factor, in comparing this case with other instances of the same crime the young age of the victim was an aggravating factor. The court reasoned the loss to society is greater when a child is killed in such a needless and senseless fashion, and the pain and suffering of the surviving family members is greater when a child is killed. The age of the victim is not an element of gross vehicular manslaughter while intoxicated, so this consideration does not violate any dual use prohibition.

Defendant contends considering the victim's age was improper because she did not select M.M. as a victim—she had no reason to know the victim would be a 10-year-old child.[9] However, rule 4.421 permits a court to consider any other factors that

---

[9] As the People point out, defendant has forfeited this claim because she made no objection on this ground below. (See *People v. Scott, supra*, 9 Cal.4th at p. 356.) However, even considering the merits, defendant has not established an abuse of discretion.

"reasonably relate to … the circumstances under which the crime was committed" (*id.*, (c)) and whether the "victim was particularly vulnerable" (*id.*, (a)(3)). Defendant's intoxicated driving put in grave jeopardy the life and safety of every individual, of any age, who was traveling around her between Lemoore and Kettleman City the night of the accident. Children are invariably among those traveling in vehicles, which defendant had every reason to know, and they are a more vulnerable victim because of their young age. As the pathologist testified, children's bones are not as developed and as thick as adults, so lesser traumas can cause basilar fractures in children, the type of skull fracture that killed M.M. in this case. Though defendant may not have selected this young victim knowingly, she reasonably knew children might be traveling on the roads around her, but she disregarded this risk and decided to drive at a high level of intoxication anyway. The death of a child is also, as the court pointed out, a greater loss to society and causes greater pain and suffering to the family because the loss is more unexpected. The young age of the victim was not an inappropriate factor for the court to consider.

Finally, defendant argues the trial court failed to consider all the mitigating factors and balance them, especially the unusual circumstance that M.M.'s mother failed to ensure he was properly seatbelted. As the People point out, the trial court acknowledged defendant's lack of a criminal record and that it was a significant mitigating factor. The court was also well aware from the trial testimony that M.M. was not seatbelted at the time of the accident, and this factor was discussed in defendant's sentencing memorandum, which the trial court indicated it had reviewed, among other things. To the extent the court considered this a contributing cause of M.M.'s death, it was entitled to disregard or give it less weight in balancing the factors. (Rule 4.409; *People v. King, supra*, 183 Cal.App.4th at p. 1322 ["'[U]nless the record affirmatively indicates otherwise, the trial court is deemed to have considered all relevant criteria, including any mitigating factors.'"]; *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1102.) On this record, we conclude the trial court properly weighed the relevant factors in mitigation.

Contrary to defendant's assertion, we conclude the trial court considered the relevant mitigating and aggravating factors, and its selection of the middle term was not so irrational or arbitrary that no reasonable person could agree with it. (*People v. Carmony, supra*, 33 Cal.4th at p. 377.)

## IV. Ability to Pay $300 Restitution Fine and $70 Court Assessments

### A. Background

As noted above, the trial court imposed a restitution fine of $300 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), suspended; a court operations assessment of $40 under section 1465.8, subdivision (a)(1); and a court facilities assessment of $30 under Government Code section 70373, subdivision (a)(1).[10] Relying on the Court of Appeal's decisions in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and *People v. Son* (2020) 49 Cal.App.5th 565 (*Son*), defendant claims the imposition of the restitution fine and court assessments without a determination she has the ability to pay violates her right to due process and equal protection. She requests that the fine and assessments be vacated and the matter be remanded for an ability-to-pay hearing.

The People assert defendant forfeited her constitutional challenge based on her failure to object in the trial court. On the merits, they contend defendant's challenge to the restitution fine should be found constitutional under the federal and state excessive fines clauses; but even if analyzed under due process principles, it was constitutionally imposed. With respect to the assessments, the People concede that due process requires the court to conduct, upon defendant's request, an ability-to-pay hearing before the assessments are imposed. They maintain, however, the imposition of the assessments in this case was harmless because defendant is able-bodied and capable of performing work.

---

[10] Defendant was also ordered to pay victim restitution of $7,500 to the California Victim Compensation Board. The court elected *not* to impose a $390 DUI fine, despite defendant's contrary assertion.

## B. *Dueñas*

In January 2019, a Court of Appeal held in *Dueñas* that court assessments under Government Code section 70373 and Penal Code section 1465.8 are fundamentally unfair and violate due process under the federal and state Constitutions when imposed upon indigent defendants without a determination of the "present ability to pay." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.) The court noted the assessment statutes were enacted to raise funds for the state courts and were not intended to be punitive. (*Id.* at p. 1165.) Nevertheless, the court reasoned, when imposition of these fines create mounting criminal justice debts from unpayable assessments, the statutes are transformed from a court-funding mechanism into additional punishment on those criminal defendants who could not pay. (*Id.* at p. 1168.) Relying on the constitutional principles of fair and equal treatment before the law for indigent defendants, as discussed in *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660, the court concluded the assessments were fundamentally unfair if imposed without a determination whether the defendant has the ability to pay. (*Dueñas, supra*, at p. 1168.)

Addressing the restitution fine separately, the court reasoned that, although a restitution fine is intended as additional punishment for a crime, section 1202.4 expressly disqualifies inability to pay as a basis for waiving the fine. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1169–1170.) The court found this provision at odds with the statutory policy requiring restitution to be consistent with a person's ability to pay (§ 1203.2, subd. (a)) and with common law principles that consider a defendant's financial circumstances when imposing a punitive award. (*Dueñas, supra*, at p. 1170.) The court also observed an indigent defendant is not afforded the same relief at probation completion as those defendants who can pay their restitution fine—those unable to pay do not have the right to have the charges dropped and to be free from the penalties of the offense for which they are on probation. (*Id.* at pp. 1170–1171.) The court concluded this limits the rights of those unable to pay and is fundamentally unfair. (*Id.* at p. 1171.)

35.

To avoid a constitutional dilemma, the court held that, while section 1202.4 required imposition of a restitution fine, the trial court must suspend execution of the fine "until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas, supra*, at p. 1172.)

Since *Dueñas*, Courts of Appeal have split regarding if and under what circumstances the constitutional concerns underpinning the decision in *Dueñas* apply. The decision in *Dueñas* was extended beyond the facts unique to Velia Deuñas's circumstances in *People v. Castellano* (2019) 33 Cal.App.5th 485, 489–491, and some Courts of Appeal followed *Dueñas*'s lead. (E.g., *People v. Belloso* (2019) 42 Cal.App.5th 647, 662–663, review granted Mar. 11, 2020, S259755.) Other courts have concluded *Dueñas* was wrongly decided, in part or in whole, or limited *Dueñas* to its facts. (E.g., *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859–861; *People v. Cota* (2020) 45 Cal.App.5th 786, 794–795; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1055; *People v. Allen* (2019) 41 Cal.App.5th 312, 326–330; *People v. Hicks* (2019) 40 Cal.App.5th 320, 325–330, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067–1069; *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844 (*Kopp*).)

"More recently, the majority in *Son* concluded that remand to allow the parties to make a record on the defendant's ability to pay was appropriate, but the panel was otherwise divided. (*Son, supra*, 49 Cal.App.5th at p. 598.) Justice Smith declined the People's invitation to limit challenges to fines and fees to the Eighth Amendment's excessive fines clause (*Son,* at p. 596, fn. 20), but concluded that a restitution fine, as punishment, survives rational basis review and may be imposed on an indigent litigant without regard to ability to pay (*id.* at p. 595). With respect to nonpunitive court facilities and court operations assessments, Justice Smith concluded that whether considered under the due process or equal protection clause, the imposition of the assessments on indigent defendants does not survive strict scrutiny and violates the Constitution. (*Son,* at

pp. 589–590.) Justice Snauffer concurred in the disposition, but did not join in or express a view on whether restitution fines are always punitive and therefore not subject to an ability-to-pay challenge. (*Id.* at pp. 598–599 (conc. opn. of Snauffer, J.).) Justice Franson, who concurred in part and dissented in part, distinguished *Dueñas* on its facts but concluded that even if a constitutional error is presumed, remand is unnecessary because the error is harmless beyond a reasonable doubt. (*Id.* at p. 599 (conc. & dis. opn. of Franson, J.).)" (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1116–1117, fn. omitted.)

The California Supreme Court is now poised to address the issues raised by *Dueñas*, having granted review in *Kopp*.

### C. *Dueñas* Claim Has Been Forfeited

Defendant was sentenced on October 29, 2019, which was more than nine months after the Court of Appeal issued its decision in *Dueñas*. Although defendant did not have a statutory right to object to imposition of the minimum $300 restitution fine under section 1202.4, the parties and the trial court had ample notice of the *Dueñas* decision. Defendant's inability-to-pay argument is predicated on *Dueñas*, and her citation to subsequently decided *Son* does not alter this conclusion. Although *Son* was not decided until 2020, an objection at the time of sentencing in October 2019 based on the inability to pay the fines and fees would not have been futile or wholly unsupported by substantive law then in existence. (See *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence."].)

Defendant argues we have the inherent authority to consider a forfeited claim. However, the failure to object in the trial court generally forfeits a claim on appeal, and this principle is applicable to constitutional claims. (*People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) Moreover,

37.

"'discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue'" (*In re Sheena K., supra*, at pp. 887–888, fn. 7). Here, as stated, defendant had ample notice prior to sentencing of *Dueñas*, on which she now relies to advance her constitutional claim. Defendant's inability-to-pay claim has been forfeited.

### D.    No Ineffective Assistance of Counsel Established

In anticipation of our conclusion that she forfeited her appellate claim under *Dueñas*, defendant alternatively argues her counsel's performance was constitutionally ineffective in failing to challenge the fine and assessments at sentencing. Defendant argues generally there could be no satisfactory explanation for her counsel's failure to object to the imposition of the assessments and restitution fine, and that had the objection been made, the record establishes defendant is unable to pay.

"'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) To establish deficient performance, defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland v. Washington, supra*, at pp. 687–688; *People v. Mickel, supra*, at p. 198.) The burden lies with the defendant to show inadequate or ineffective representation, and the proof "'must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

In the context of a direct appeal, we examine the record to see if there is any explanation for the challenged aspects of representation. (*People v. Mai, supra*, 57 Cal.4th at p. 1009.) If the reasons for defense counsel's actions are not readily apparent

from the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the record discloses no conceivable tactical purpose for counsel's act or omission. (*Ibid.*)

The challenged fine and assessments total $370. The record shows defendant was 29 years old at the time of sentencing. She had graduated from high school and had taken some college courses. She also had an employment history, as noted in the probation report and bail review report, although at the time of her arrest defendant was not regularly employed outside the home.

Defendant is a young woman, and her prison term is limited to six years, a good portion of which she had served before sentencing. Since defendant had an employment history prior to her arrest and conviction, and she suffers no physical disabilities precluding work, the record implies a reason why counsel may not have objected to the $370 fine and assessments—counsel may have reasonably believed defendant has the ability to pay presently or retains the ability to pay in the future. As there is a conceivable reason for counsel's failure to object to imposition of the $370, on this record defendant has not established any deficient performance by her counsel.

## DISPOSITION

The judgment is affirmed.


MEEHAN, J.

WE CONCUR:


HILL, P. J.


PEÑA, J.