[No. A052766. First Dist., Div. Two. Oct. 30, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
NORMAN R. HANSEN, JR., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication except for parts II, III, IV, V, and VI.

**COUNSEL**

Marisa Nayfach, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KLINE, P. J.—**

### Introduction

Norman R. Hansen, Jr., appeals his conviction of one count of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)), two counts of driving under the influence of alcohol and causing bodily injury (Veh. Code, § 23153, subd. (a)), two counts of driving with a blood-alcohol level of .08 percent or more and causing bodily injury (Veh. Code, § 23153, subd. (b)), and a finding that in violating Vehicle Code section 23182, he caused injury to more than one person. Appellant admitted that he had suffered two prior drunk driving convictions.

He raises several contentions, principal among them that the trial court erred in permitting the prosecutor in closing argument to argue a theory of liability based in part on his failure to ensure that his passengers were restrained by a safety belt.

*Statement of the Case and Facts*

Shortly after 1 a.m. on May 18, 1990, a Datsun 280 ZX sports car driven by appellant on Highway 92 plunged off a cliff. Diane Janssen, a passenger in the car, was killed. Appellant and Teresa Sabin, also a passenger, were injured.

The evidence showed that Janssen and Sabin were good friends. They had met earlier in the evening at the Pioneer Saloon in Woodside so that Sabin could meet Janssen's new boyfriend, appellant, whom Janssen had been dating for about three and a half weeks. All three had numerous drinks during the evening. At one point appellant and Janssen left for dinner, and returned later. Roger Proctor, manager of the saloon, recalled serving appellant four or five beers and about five shot glasses of tequila. Proctor remembered thinking that appellant was not a customer on whom the effect of drinking was easy to detect. At the time appellant left with Sabin and Janssen (between 12:30 and 1), Proctor had no sense he was impaired by his drinking.

Sabin and Janssen had driven separately to the saloon. Sabin felt she had had too much to drink and was planning to call a cab to take her home. Janssen persuaded her to go with Janssen and appellant in appellant's car to the home of appellant's aunt near Half Moon Bay. They walked directly to the car. Appellant did not appear intoxicated. Sabin thought appellant was the designated driver. Janssen got in the back of appellant's car, sitting cross-legged on the folded-down backseat. She was positioned mostly behind the front passenger seat. Because the back was folded down, it was not possible for her to be restrained by a seat belt. Her head was fairly close to the car's ceiling. Sabin sat in the front passenger seat. Apparently because of her girth or the configuration of the interior of the automobile, she was unable by herself to locate and fasten the seat belt. Her request for assistance from appellant was unheeded.

The accident occurred about 15 or 20 minutes after the group left the saloon. Sabin testified appellant drove normally until he reached Highway 280. There he began speeding, at least 80 miles per hour, and weaved from lane to lane without reason. Sabin asked him several times to slow down. Several times she repeated her request for assistance in using the seat belt. Eventually, after Janssen also asked him to slow down, he reduced his speed to 70 miles per hour. Sabin continued to ask appellant to slow down. Appellant did not respond to any of these requests. Although he had spoken to Sabin and others at the saloon, he never spoke while in the car. Appellant took the westbound Highway 92 exit from 280. At the end of the exit ramp,

near the Crystal Springs Reservoir, Sabin, who was scared, asked appellant to pull over. She said she could drive better. He did not respond. The road at that point became winding and narrow. Appellant drove terribly—speeding and entering the opposite lane as he negotiated the curves. He was exceeding 40 miles per hour around curves that should have been driven at 20 or 25 miles per hour. Sabin repeatedly demanded that appellant pull over and let her out.

After a hairpin turn at the summit, Sabin once again demanded that appellant stop the car so she could leave. Again, he did not respond. After the car completed the hairpin turn and approached the first significant straightaway on Highway 92, Sabin saw the headlights of an oncoming vehicle off to the left. The car appeared to be in its own lane, and she did not fear a collision. There was nothing unusual about the headlights. She looked away to her right before the vehicle passed. Neither Sabin nor Janssen touched the steering wheel at any time, grabbed appellant or otherwise interfered with his driving.

The approaching lights belonged to a tractor trailer truck driven by Eric Nyland. Nyland testified he was driving with a full load about 20 or 25 miles per hour and did not have his bright lights on. He saw the headlights of appellant's car approaching him after it rounded a curve. The car, which was going about 40 or 50 miles per hour, did not appear to be doing anything unusual. Immediately after passing the car, Nyland heard tires squealing. He looked in his rear view mirror and saw the car out of control, still on the pavement, but with its back end out of the lane (fishtailing), and headed toward the shoulder of the road on the right as the car pointed left. The car's front wheels seemed to be locked. Then the car swung around to the right and shot off the road and the cliff.

Sabin noticed the gravelly sound of the tires on the shoulder as the car left the road. She felt no erratic movements of the car, which at that point was not speeding.

According to Nyland, the accident occurred about 1:20 a.m. About 20 minutes later, he reached a phone and called for help. California Highway Patrol (CHP) officers responded to the scene around 1:40 a.m. All three occupants had been ejected from the car. They found Janssen lying on top of a car door, dead. Appellant was lying facedown in poison oak with his arm in the air. He had a head injury and many cuts and scrapes. He was so highly intoxicated he could not initially respond to questions, though he became more responsive over time. Appellant could not, however, follow a full line of questioning. Asked how the accident happened, he said, "I'm sorry."

Asked where he was coming from, he said, "I don't know, I'm sorry." He repeatedly said he was sorry, that he did not mean to drive off the road.

At the hospital, appellant, who had been hit on the head, was diagnosed with a presumptive mild concussion. His slurred speech and fluctuation between consciousness and unconsciousness were, however, more symptomatic of drunkenness than of concussion. A treating physician concluded appellant was very intoxicated. A blood sample drawn from him at 4:36 a.m., showed his blood-alcohol level to be .20 percent. In order to register a blood-alcohol level of .20, appellant, a 230-pound man, would have had the equivalent of 15 drinks in his system.

Investigation of the accident scene the next day by the CHP showed the accident took place on a straightaway. There was a 77-foot tire track comprised of a 12-foot black tire mark, going from an "edge line" (2 feet to the left of the end of the asphalt road surface) to a point where a dirt shoulder began, a 22-foot tire track on the dirt shoulder, a 43-foot track that went along an upward sloping berm, over it, and off the cliff. The tire track moved gradually off the road; there was no indication of sudden turns.

The next day appellant told Jean Olivier, a social worker at the hospital, that he could not remember whether the passenger in the front seat pulled the wheel. He had no clear memory how the accident happened. A few days later appellant called Olivier to ask what he told her at the time of the accident. He said he had an attorney and was starting to remember things.

After she had been in the hospital for a day or two, Sabin received a phone call from appellant. He said he did not remember what happened and asked if she knew. He asked her if she had grabbed the wheel, and she said she had not. The last thing she remembered was seeing the headlights of a car. Appellant then said, "Oh, somebody tried to run me off the road?" She said, "No, I just remember seeing headlights. I think they probably blinded you. . . ."

Appellant later told a doctor he was regaining his memory through flashbacks and the accident occurred when he tried to avoid some bright lights that were swerving toward him from the other side of the road. Later, he added that someone had grabbed the steering wheel, making the car veer off the road.

*Defense.* Appellant did not testify. His defense was that he was not impaired by alcohol at the time of the accident and that the accident was solely caused by a passenger who panicked and grabbed the steering wheel.

The defense presented several witness who testified that in the days following the accident appellant told them that he was slowly regaining his memory. Appellant told Dr. Heidi Wortel, a psychiatrist who saw appellant in the hospital, that he was regaining his memory in flashbacks and dreams and that he was relieved as these dreams indicated he was not responsible for the accident. He was seeking reassurance that he could trust these dreams. Dr. Wortel told him he could not necessarily trust them. Olivier testified appellant had told her shortly after the accident that someone may have pulled on the steering wheel.

John King, owner of the company that towed and stored appellant's car after the accident, had no recollection of telling CHP Officer Steven Mudders that appellant had told King that a passenger had pulled his steering wheel. However, Mudders testified he spoke with King during his investigation and King stated appellant had told him that the "passenger in the right front seat grabbed the steering wheel" and that as a result he lost control of the car.

David Schmidt, a reconstructionist with the Traffic Safety Research Corporation, was qualified as an expert in the area of accident reconstruction. Based upon observations at the scene and calculations he opined that 43 miles per hour would have been well within a safe range of speed for the horseshoe curve just before the straight strip of road where the accident occurred. In his opinion, Nyland's testimony was consistent with the physical evidence and Sabin's testimony was in many respects inconsistent with Nyland's testimony and the physical evidence. According to Schmidt, Sabin's statement that she did not hear or feel anything abnormal in the car's movement was inconsistent with Nyland's testimony that he heard the car's tires squeal and saw it fishtail, as well as with the marks on the road. Schmidt pointed out that Highway 92 is more winding in the uphill portion, and observed that appellant had negotiated the most difficult part of the road and that the accident had occurred in the first straightaway of any length. Referring to a statement appellant had made that a passenger had pulled on the steering wheel, Schmidt concluded the car's fishtailing was consistent with violent movements of the steering wheel by someone in the car.

Schmidt also concluded glare would not have been a factor in the accident, as Nyland's truck was designed not to cause glare. The truck's beam would not have been focused so as to come into the eyes of a driver of an oncoming vehicle.

Appellant also presented testimony of a forensic toxicologist who agreed with the prosecution's expert that it was not possible to determine with any

degree of accuracy the individual's blood alcohol at 1:20 a.m. He testified that appellant's blood alcohol could have been significantly lower at the time of the accident than when it was tested more than three hours later.

The jury found appellant guilty on all 5 counts, and found true the multiple victim great bodily injury enhancement. The court denied appellant's new trial motion and sentenced him to a total term of 11 years in prison: the upper term of 10 years for gross vehicular manslaughter (count 1) and a 1-year enhancement for injuring more than 1 person. He received a concurrent sentence of three years for count 2 (driving under the influence and causing bodily injury to Sabin). Imposition of sentence on counts 3 (driving with a blood-alcohol level of .08 or more and causing bodily injury to Sabin), 4 (driving under the influence and causing bodily injury to Janssen), and 5 (driving with a blood-alcohol level of .08 or more and causing bodily injury to Janssen) was stayed. He received total credits of 320 days and was ordered to pay restitution of $100.

This timely appeal followed.

### Discussion

The chief contention in this case is that the trial court erred in permitting the prosecution to argue a theory of liability under Penal Code section 191.5 and Vehicle Code section 23153, based in part upon appellant's failure to ensure that his passengers had and used seat belts.

### I.

Penal Code section 191.5, subdivision (a), defines "[g]ross vehicular manslaughter while intoxicated" as "the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23152 [driving under the influence][1] or 23153 [driving under the influence with injury][2] of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act,

---

[1] Vehicle Code section 23152 provides in relevant part: "(a) It is unlawful for any person who is under the influence of an alcoholic beverage or any drug, or under the combined influence of an alcoholic beverage and any drug, to drive a vehicle."

[2] Vehicle Code section 23153 provides in relevant part:

"(a) It is unlawful for any person, while under the influence of an alcoholic beverage or any drug, or under the combined influence of an alcoholic beverage and any drug, to drive a vehicle and, when so driving, do any act forbidden by law or neglect any duty imposed by law in the driving of the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver.

"(b) It is unlawful for any person, while having 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle and, when so driving, do any act forbidden by law or

not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence."

Vehicle Code section 27315, the mandatory seat belt law, provides in relevant part: "(d)(1) No person shall operate a private passenger motor vehicle on a highway unless that person and all passengers four years of age or over are restrained by a safety belt."

During closing argument, the prosecutor in effect argued that the jury could find that appellant's driving the car in which the passengers were not using seat belts could constitute the act or omission proximately causing Janssen's death and Sabin's injuries. The prosecutor discounted evidence that Sabin or Janssen had pulled the wheel, causing the car to swerve in violation of Vehicle Code sections 21650 (failure to drive upon the right side of the roadway) or 22107 (unsafe turning or movement)—the unlawful acts charged as statutory violations in the information. However, she also urged that if the jury believed a passenger pulled the wheel they could still convict appellant on the theory that in failing to ensure that his passengers were belted and in ignoring Sabin's request for a seat belt, he committed with gross negligence an unlawful act or he committed with gross negligence an act ordinarily lawful which might cause death.

The jury was never informed by the court or even by counsel that the failure to ensure that passengers were belted was a Vehicle Code violation. Nevertheless, the closing argument of the district attorney emphasized that failure to "make sure that his passengers were seat belted in his car" was an alternative to the unlawful acts charged as independent Penal Code violations. She also argued that if the jury believed a passenger yanked the wheel, causing the car to swerve out of its lane, it could still find appellant guilty of either a grossly negligent unlawful act or of a lawful act, done in a grossly negligent manner based upon appellant's failure to "[make] sure his passengers were seat belted appropriately . . . ."

Appellant contends that the failure to ensure that passengers are belted in their seats cannot as a matter of law constitute the *act* upon which liability is premised.

Respondent attempts to recast the issue as one of substantial evidence, arguing that substantial evidence supported the "totality of the circumstances" theory on which the jury could have convicted appellant, even if the

neglect any duty imposed by law in the driving of the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver.

" . . . . . . . . . . . . . . . . . . . . . . .

"(c) In proving the person neglected any duty imposed by law in the driving of the vehicle, it is not necessary to prove that any specific section of this code was violated."

jurors believed a passenger pulled the wheel. We resist this artful recharacterization of the issue. In our view the issue is one of care, namely whether the failure to ensure passengers are belted in their seats may constitute the "commission of an unlawful act" within the meaning of Penal Code section 191.5, subdivision (a) (or the "commission of a lawful act which might produce death, in an unlawful manner" when such acts were done under circumstances constituting gross negligence). If it may, the remaining question is whether the circumstances of appellant's act provide the gross negligence also necessary in order to convict him under that statute. (Pen. Code, § 191.5, subd. (a).)

The jury was presented with alternative theories of guilt. Jurors were instructed that appellant could be convicted of gross vehicular manslaughter while intoxicated if he (1) drove while intoxicated, and (2) either "*committed with gross negligence an unlawful act, namely violation of either Vehicle Code section 21650 or 22107 . . . or, that he committed with gross negligence, an act ordinarily lawful which might cause death,*" and (3) the unlawful or grossly negligent act was a proximate cause of death. (CALJIC No. 8.93.)[3]

Respondent concedes that if a passenger grabbed the wheel, as appellant claimed, the prosecution theory of independent statutory violations of Vehicle Code sections 21650 or 22107 would be negated. Respondent maintains, however, that in that event, under the instructions it received, the jury could only have convicted appellant under the alternative theory finding him grossly negligent based upon *all* his actions (including the circumstances of his intoxication) and not merely his failure to restrain his passengers in seat belts. This argument appears to eliminate from Penal Code section 191.5 the

---

[3]At the time of trial, CALJIC No. 8.93 provided in its entirety:

"[Defendant is accused in [Count[s] __ of] the information of having committed the crime of [Gross] Vehicular Manslaughter While Intoxicated in violation of Section [191.5] [192(c)(3)] of the Penal Code.]

"Every person who drives a vehicle [in a grossly negligent manner and] in violation of Section [23152] [or] [23153] of the Vehicle Code, and unintentionally but unlawfully kills another human being, is guilty of the crime of [Gross] Vehicular Manslaughter While Intoxicated in violation of Penal Code Section [191.5] [192(c)(3)].

"A killing is unlawful when a person [commits an act inherently dangerous to human life or safety, amounting to a misdemeanor or an infraction, as defined in these instructions,] [or] [negligently commits an act ordinarily lawful which might produce death,] which [unlawful] [or] [negligent] act is a proximate cause of the death of another human being.

"In order to prove such crime, each of the following elements must be proved:

"1. The driver of a vehicle violated Vehicle Code Section [23152] [or] [23153];

"2. In addition to such violation, the driver of the vehicle [committed [with gross negligence] an unlawful act, namely a violation of __,] [or] [committed [with gross negligence] [negligently] an act ordinarily lawful which might cause death]; and

"3. Such [unlawful] [or] [negligent] act was a proximate cause of the death of a human being." (5th ed. 1988.)

element of the commission of an unlawful act or lawful act in an unlawful manner, substituting the element of gross negligence where the defendant drives while intoxicated.[4]

Although the distinction between an "unlawful act" and a "lawful act" done in an "unlawful manner" tends to disappear in the context of vehicular manslaughter (see *People* v. *DeSpenza* (1962) 203 Cal.App.2d 283, 287 [21 Cal.Rptr. 275]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 531, p. 601 ["driving at an excessive speed or in violation of other traffic rules can be viewed as an unlawful act or as a lawful act performed in an unlawful manner"]), no case of which we are aware so merges the element of the actus res with the element of gross negligence as to eliminate the requirement of the commission of some act or neglect "in the driving." (Pen. Code, § 191.5.)

The act or neglect of duty which satisfies the actus reus element of the offense may in some situations also constitute gross negligence, satisfying that element as well. ■ It is, however, established that the fact that a defendant drives a motor vehicle while under the influence of alcohol and violates a traffic law is insufficient to constitute gross negligence. (E.g., *People* v. *Bennett* (1991) 54 Cal.3d 1032, 1036, 1039 [2 Cal.Rptr.2d 8, 819 P.2d 849]; CALJIC No. 8.94.) Gross negligence must be determined by considering the overall circumstances of the defendant's intoxication or the manner in which he drove, or other relevant aspects of defendant's conduct resulting in the fatal accident. (*People* v. *Bennett, supra,* 54 Cal.3d 1032, 1037, 1039.) As explained in *People* v. *Von Staden* (1987) 195 Cal.App.3d 1423, 1427 [241 Cal.Rptr. 523], "gross negligence can be shown by the *manner* in which the defendant operated the vehicle, that is, the overall circumstances (rather than the mere fact) of the traffic violation." (Accord *People* v. *Bennett, supra,* at p. 1037, italics in original.)

In *People* v. *Bennett, supra,* 54 Cal.3d 1032, the defendant was convicted of gross vehicular manslaughter while intoxicated. (Pen. Code, § 191.5, subd. (a).) It was undisputed that he committed a traffic offense while intoxicated. The only contested issue was whether he was grossly negligent. The defendant challenged CALJIC No. 8.94, which instructs the jury to

[4]Indeed, respondent asserts in a footnote: "*We are not persuaded that there is any difference between the gross negligence element of the crime and either of the alternative actus reus elements—a nonfelonious grossly negligent unlawful act or a life-threatening grossly negligent lawful act. In our view the concept of gross negligence subsumes both those possibilities.* In reality, the crime consists of the following elements: an act of driving that proximately causes death—a 'killing act'; intoxication while driving; and a series of acts that (1) proximately cause the killing act, (2) are grossly negligent, and (3) are done with general criminal intent." (Italics added.)

determine gross negligence from "the overall circumstances of the defendant's intoxication *or* the manner in which he drove, or both . . . ." (54 Cal.3d at p. 1035, italics added.) He contended the instruction erroneously allowed the jury to find gross negligence from the overall circumstances of his intoxication, rather than in the manner of his operation of the vehicle. (*Id.*, at pp. 1034, 1037.) The Supreme Court rejected this contention, agreeing with *People* v. *Von Staden, supra,* 195 Cal.App.3d 1423, that gross negligence may be based upon the overall circumstances of the defendant's intoxication. According to the court, "a driver's level of intoxication is an integral aspect of the 'driving conduct." (*People* v. *Bennett, supra,* at p. 1038.) "The jury should therefore consider all relevant circumstances, including level of intoxication, to determine if the defendant acted with a conscious disregard of the consequences rather than with mere inadvertence. [Citations.]" (*Ibid.*)[5]

*Bennett* supports the view that the circumstances of appellant's failure to ensure that passengers are belted in their seats could be a relevant factor in the jury's assessment of whether appellant was grossly negligent. This does not answer the question whether failure to restrain passengers in seat belts is sufficient by itself to constitute the unlawful act or lawful act in an unlawful manner "in the driving," as required by Penal Code section 191.5 and Vehicle Code section 23153.

■ It is established that "the unlawful omission element of [Veh. Code] section 23153 need not relate to any specific section of the Vehicle Code, but instead may be satisfied by the defendant's *ordinary negligence.* (§ 23153, subd. (c); *People* v. *Oyaas* (1985) 173 Cal.App.3d 663, 669 [219 Cal.Rptr. 243].)" (*People* v. *Hernandez* (1990) 219 Cal.App.3d 1177, 1185 [269 Cal.Rptr. 21], italics added.) We believe the same is true of the "unlawful act" element of Penal Code section 191.5. The question thus becomes whether the failure to ensure that passengers utilize seat belts may constitute *ordinary negligence.*

■ Appellant argues that Vehicle Code section 27315, the mandatory seat belt statute, indicates the Legislature never intended that a finding of ordinary negligence could be based upon the failure to ensure passengers are restrained by seat belts. Nothing in the language or legislative history of section 27315 appears to anticipate its use in a criminal manslaughter prosecution of this type. The penalties for this infraction are monetary only

---

[5]The Supreme Court did suggest rewording the instruction to "more precisely advise the jury that 'The mere fact that a defendant drives a motor vehicle while under the influence of alcohol and violates a traffic law is insufficient in itself to constitute gross negligence. You must determine gross negligence from the level of the defendant's intoxication, the manner of driving, or other relevant aspects of the defendant's conduct resulting in the fatal accident.' " (*Id.*, at p. 1039, fn. omitted.)

and the statute expressly states that "[i]n any civil action" a violation of its provisions "shall not establish negligence as a matter of law or negligence per se for comparative fault purposes, but negligence may be proven as a fact without regard to the violation." (Veh. Code, § 27315, subd. (j).) Appellant urges that the statute by its own terms indicates that the failure to utilize seat belts may not be used in a civil action to establish negligence. A fortiori, he says, failure to ensure that passengers use seat belts cannot constitute a negligent act or omission in a criminal action. We disagree.

The mandatory seat belt statute is irrelevant to the question whether failure to ensure passengers utilize seat belts may constitute ordinary negligence in the circumstances of this case. The statute was not relied upon or referred to at trial and respondent does not claim that its violation would support the finding of an independent statutory violation in the same way as speeding or failing to stay in one's own lane. In other words, the People have never claimed, at trial or on this appeal, that violation of the mandatory seat belt law is the "unlawful act" under Penal Code section 191.5; their claim is simply that the failure to ensure use of a seat belt is ordinary negligence, which satisfies the "unlawful act" element of that statute.

Recently, in *Housley* v. *Godinez* (1992) 4 Cal.App.4th 737 [6 Cal.Rptr.2d 111], the Fifth District held the jury in a civil action could consider violation of the mandatory seat belt statute as part of its determination of the negligence issue. According to the court: "While subdivision (j) of section 27315 precludes defense arguments that a violation of the statute constitutes 'negligence as a matter of law or negligence per se,' nothing in the statute prohibits a jury from knowing and considering its very existence when determining the reasonableness of driving without a seat belt. Thus, the Legislature did not use language in the section which would totally ban use of the seat belt statute as a factor in determining negligence. It is well established in California case law that juries may be instructed upon criminal statutes even when the statute itself does not establish a presumption of negligence under Evidence Code section 669, California's codification of the doctrine of 'negligence per se.' " (*Id.*, at pp. 744-745, fn. omitted.)

According to *Housley*, "it was the Legislature's plain intent to allow section 27315 to play the traditional role of a statute in tort litigation, a factor to be considered by the jury in determining the reasonableness of the conduct in question. [Citation.]" (4 Cal.App.4th at p. 747.) Thus, *Housley* disposes of appellant's contention that the statute precludes any consideration of the failure to ensure passengers are fastened in seat belts as negligence. ██ Rather, *Housley* supports the commonsense view that whether the failure to ensure passengers are fastened in seat belts constitutes

a negligent act or omission, i.e., an "unlawful act" within the meaning of Vehicle Code section 23153 and Penal Code section 191.5, is a question of fact for the jury.

Appellant posits the situation in which an intoxicated individual drives in a flawless manner, but is run over by a truck and then charged with gross vehicular manslaughter because his passenger, who was not in a seat belt, died. Appellant argues that it would be unreasonable and unfair to subject this driver to criminal liability for gross vehicular manslaughter. This problem does not genuinely exist. As earlier noted, the law recognizes that the violation of a statute or the commission of a negligent act or omission in the driving of a motor vehicle while intoxicated will not support a conviction of gross vehicular manslaughter *unless* the circumstances of the defendant's intoxication or the manner in which he drove evidence gross negligence— not mere inadvertence—but a conscious disregard of the consequences. ██ Such gross negligence was clearly evidenced in this case, where appellant failed to heed repeated requests from his passengers to slow down, and where he not only merely failed to ensure they used seat belts, but ignored Sabin's express request for help in finding the seat belt.

Accordingly, we conclude the trial judge did not err in permitting the prosecutor to argue to the jury, in effect, that appellant's failure to ensure that his passengers were restrained by seat belts could constitute the "commission of an unlawful act" or the "commission of a lawful act which might produce death, in an unlawful manner," within the meaning of Penal Code section 191.5, subdivision (a).

## II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## *Disposition*

The judgment of conviction is affirmed. The matter is remanded for resentencing.

Benson, J., and Peterson, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied January 28, 1993. Panelli, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1065.

†Presiding Justice of the Court of Appeal, First District, Division Five, sitting under assignment by the Chairperson of the Judicial Council.