Filed 9/22/25  P. v. Sanchez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>ROBERT SANCHEZ,<br><br>　　Defendant and Appellant. | B340079<br>(Los Angeles County<br>　Super. Ct. No. NA117723) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed.

The Community Law Group and Mark Stephen Smith, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jason Tran, Supervising Deputy Attorney General, and Herbert S. Tetef, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Robert Sanchez crashed his pickup truck while driving away from a neighborhood park with his children.  The truck flipped several times, killing his daughter and severely injuring his son.  Also injured from the crash, defendant was taken to a hospital where his blood was drawn for treatment.  Testing by the hospital, and later by the police, revealed a .17 percent blood alcohol content.  Defendant was convicted of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)),[1] driving under the influence causing injury (Veh. Code, § 23153, subd. (a)), driving with or above .08 percent blood alcohol content causing injury (*id.*, § 23153, subd. (b)), and two counts of child abuse likely to produce great bodily harm or death (§ 273a, subd. (a)).

In this direct appeal, defendant contends insufficient evidence supports his conviction for gross vehicular manslaughter while intoxicated.  In addition, he challenges the admission of blood evidence, the purported exclusion of a defense witness, and jury instructions and verdict forms.  He also raises more than five claims of ineffective assistance of counsel.  We affirm.

---

[1]     Subsequent unspecified references to statutes are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. Prosecution Evidence**

1. *The Car Accident*

In July 2021, Adriana Rodriguez and defendant were coparenting their four-year-old children, Robby and Jayda.[2] Around 8:00 p.m. on July 9, 2021, defendant crashed his truck while leaving a neighborhood park with both children. Jayda died from the crash. Defendant and Robby were critically injured. Several individuals who witnessed the crash testified.

Robby testified that while he and Jayda played at the park, he saw defendant drinking a beer.[3] As they were driving away in defendant's truck, Jayda began to cry in the back seat. Defendant continued driving while unbuckling Jayda and moving her to the front seat.

Vernell Mosley-Mitchell was about to leave the park when he heard screeching brakes. He looked up and saw the passenger side of a burgundy truck and a sedan that "had cut in front of the truck," attempting a U-turn. The truck swerved, flipped, and began to roll. The truck hit a tree, fire hydrant, and pole before coming to rest on the truck's driver's side. Mosley-Mitchell ran to the truck, where another person had pulled a small boy from a back seat window. Defendant was in the driver's seat, nonresponsive, and holding the legs of a small girl who was pinned between the driver's side door and ground.

Cheryl Nino also saw a purple truck in the street "coming so fast" it startled her. She watched the truck "go straight and

---

[2] Several witnesses share the same last name. For ease of reading, we refer to them by their first name. We intend no disrespect.

[3] Robby told a social worker defendant drank "'a big beer.'"

3

veer" across the street before hitting a pole and tree. Nino did not see another car near the truck.

2. *Emergency Medical Care*

Paramedics transported defendant, Jayda, and Robby to a nearby hospital. Jayda died from blunt force trauma to her head. Robby was hospitalized for six weeks. While at the hospital, Adriana asked defendant "[w]hy was he drinking and driving with the kids and why was she [(Jayda)] in the front seat." He replied, "'I'm sorry. I know. I know.'"

Registered nurse Tannaz Tehranirad attended to defendant, a trauma patient at the hospital, the night of July 9, 2021. She was present for defendant's blood draw, and while unable to confirm if she personally drew his blood, Tehranirad affirmed "[e]ither [she] or [her] colleagues" drew his blood. Tehranirad discussed the procedures for drawing blood of all trauma patients and transmitting samples to the hospital's laboratory. Tehranirad reviewed defendant's medical records and confirmed his blood was drawn at 9:27 p.m. on July 9, 2021.

The clinical lab director at the hospital verified registered nurses are required to draw blood from every critical emergency patient and submit each sample to the hospital laboratory for automated testing. The testing machines are overseen by licensed personnel and maintained through various calibration processes and quality management systems. The laboratory holds the collected blood in a refrigerator for six days. The director confirmed defendant's blood was kept in the same manner as all other samples and that quality control measures did not find any errors in its processing. Records confirmed

4

testing results showed defendant's blood ethanol level was 197 milligrams per deciliter.

### 3. *Subsequent Blood Testing*

Detective Daniel Ramirez obtained a search warrant for blood drawn at the hospital. On July 12, 2021, his partner, Officer Andrew Guzman, presented the warrant to a laboratory manager who placed three vials of defendant's blood in an envelope Officer Guzman transported to a police laboratory. Officer Guzman completed a property report,[4] placed the vials in a clear plastic bag and evidence envelope, and placed the envelope in a secured refrigerator.

Around 6:00 a.m. on July 13, 2021, lead criminalist Melissa Kramer-Sarrett retrieved the envelope for testing. Two vials inside had come loose and spilled blood inside the evidence bag. As these vials were compromised, Kramer-Sarrett used the blood from the remaining vial to conduct two analyses. That vial contained an anti-coagulant but did not contain a preservative, as is generally required under Title 17 of the California Code of Regulations ("Title 17"). Preservatives prevent blood fermentation, a "very remote" process that can occur if a blood vial is left unrefrigerated for "well over five days" or refrigerated longer than 182 days. Because her laboratory and police property rooms refrigerate all blood samples, Kramer-Sarrett regularly tests blood vials that do not contain a preservative for "purposes under Title 17."

Kramer-Sarrett used two machines to analyze defendant's blood, which reported .171 and .172 percent blood alcohol

---

[4]     Officer Guzman listed Jayda's name on the property report.

5

content.[5]  Kramer-Sarrett affirmed these tests complied with Title 17.  In a report, Kramer-Sarrett listed Jayda's name under a heading entitled, "name associated."  This was not a mislabel but was the name under which the samples were booked.  Using another document ("a 314"), the lab changed the associated name from Jayda to defendant.

### 4.  *Additional Investigation*

Detective Ramirez and other officers investigated the crash.  A broken booster seat was found in the back seat of defendant's truck.  On the ground around the flipped truck, officers located an intact child seat, a marijuana grinder, and beer and vodka bottle caps.  Detective Ramirez examined defendant's truck at a police tow yard.  The front passenger seatbelt was locked in place, which suggested it was not used during the crash.

A collision investigation officer reviewed the truck's data recorder and confirmed the driver and front passenger seatbelts were not in use.[6]  Five seconds before the crash, the truck was traveling 51 miles per hour in a posted speed limit of 45 miles per hour, placing the vehicle in the 85th percentile for speed in the area.  Defendant applied "very slight pressure" to the brakes two

---

[5]     This measurement, which is done in grams per deciliter, is different than the milligrams-per-deciliter measurement used by the hospital.  Kramer-Sarrett testified that 197 milligrams per deciliter of alcohol in blood serum was "equivalent to a .157 upward to a .179 percent whole blood equivalency."

[6]     The officer testified that child car seats require straps to secure the child and restrain the seat.  "This way if there is an event where the seatbelts do lock, that locking seatbelt will lock the car seat in place. . . ."

seconds before collision and "full brake pressure" one second before collision.

A child abuse pediatrician reviewed this evidence and Jayda's injuries. Based on the evidence, the pediatrician testified Jayda was unrestrained and hit her head on the truck or pavement during the crash.

Police executed a search warrant for defendant's Instagram records. In January 2021, a woman messaged defendant and said she had been at a bar in Anaheim. Defendant replied, "'I don't remember. Shit. I got a flat on ea [*sic*] home. . . . I hate getting too drunk.'" The woman told defendant her friend "'crashed on the way home and got a D.U.I.'" He replied, "'Oh, my god. See, exactly what I don't want. I'm so lucky. I gotta stop drink[ing] n driving.'"

## B. Defense Evidence

A man who had seen defendant the day of the crash testified that defendant did not exhibit signs of intoxication. A traffic collision reconstructionist reviewed the data recordings and collision reports. Assuming a hypothetical scenario in which a vehicle made a sudden U-turn in front of defendant's truck, the reconstructionist did not believe defendant displayed inattention or lack of collision avoidance and instead engaged in various maneuvers to avoid danger. The reconstructionist formed this opinion despite having no information on the hypothetical distance between the vehicle and defendant's truck.

## C. Verdict and Sentencing

Following trial in May 2024, a jury convicted defendant on all charged counts (§ 191.5, subd. (a) [count 1]; Veh. Code,

7

§ 23153, subds. (a), (b) [counts 2–3]; § 273a, subd. (a) [counts 6–7]) and found true various enhancement allegations (§§ 12022.7, subd. (d), 12022.95).  Defendant was sentenced to an overall term of 50 years to life imprisonment.

## DISCUSSION

### A.  Sufficiency of Evidence of Gross Vehicular Manslaughter

Defendant contends insufficient evidence supports the finding he drove in a grossly negligent manner, as required for gross vehicular manslaughter while intoxicated.  We disagree.

1.  *Governing Law*

Gross vehicular manslaughter while intoxicated requires: (1) driving a vehicle while intoxicated; (2) when driving, committing some unlawful act with gross negligence or committing with gross negligence an ordinarily lawful act which might produce death; and (3) as a proximate result, another person is killed.  (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1109 (*Batchelor*), disapproved on another ground in *People v. Hicks* (2017) 4 Cal.5th 203.)  Gross negligence "'is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.'"  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204 (*Ochoa*).)  The test to determine gross negligence is "*objective*" but may include information the "defendant knew, including his actual awareness of those risks. . . .  [I]f the evidence show[s] that defendant *actually*

8

*appreciated the risks* involved in a given enterprise, *and nonetheless proceeded* with it," the finding of gross negligence is appropriate. (*Id.* at p. 1205.)

With any insufficiency of evidence claim, we must determine whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.) We view the evidence in the light most favorable to the judgment and presume every fact that can be reasonably deduced from the evidence. (*Ibid.*)

2.    *Analysis*

Substantial evidence supports the finding defendant drove his truck with gross negligence while intoxicated. Defendant drove with a blood alcohol content of .17 percent and was speeding—traveling in the 85th percentile of drivers in that area—while he and Jayda were unrestrained in the front seats. (See *Batchelor*, *supra*, 229 Cal.App.4th at p. 1110; *People v. Hansen* (1992) 10 Cal.App.4th 1065, 1068, 1078).[7] Defendant drove in this manner despite appreciating the dangers of driving under the influence. (See *Ochoa*, *supra*, 6 Cal.4th at pp. 1205–1208.) These are all circumstances the jury was instructed to consider. (CALCRIM No. 590.)

Defendant does not dispute these facts and instead argues he "functioned as an ordinary person" faced with a sudden, U-turning car. His argument is insufficient to warrant reversal of his conviction for several reasons.

---

[7]    Subject to various exceptions, "a parent, . . . who transports a child under eight years of age on a highway in a motor vehicle, . . . shall properly secure that child in a rear seat . . . ." (Veh. Code, § 27360, subd. (a).)

First, defendant cites no portion of the trial record in support of his argument.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [it is improper to assume "this court will construct a theory supportive of [defendant's] innocence"].)

Second, defendant's argument construes the evidence in his favor.  (See *People v. Tran* (2022) 13 Cal.5th 1169, 1204 [that "'"circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal"'"]; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 228 [it is insufficient to misfocus on evidence "favorable to his position"].)

Third, defendant relies on cases that do not support his argument.  These decisions hold "that gross negligence can be shown by the *manner* in which the defendant operated the vehicle, that is, the overall circumstances (rather than the mere fact) of the traffic law violation" and driving while intoxicated.  (*People v. Von Staden* (1987) 195 Cal.App.3d 1423, 1427 (*Von Staden*); see *People v. McNiece* (1986) 181 Cal.App.3d 1048, 1057, disapproved on another ground in *People v. McFarland* (1989) 47 Cal.3d 798; *People v. Stanley* (1986) 187 Cal.App.3d 248, 255 (*Stanley*) [following *McNiece*], overruled by *People v. Bennett* (1991) 54 Cal.3d 1032.)  Contrary to defendant's suggestion, however, these decisions do not compel a particular combination of facts to establish gross negligence; they simply analyzed the facts before them.  (See *Von Staden*, *supra*, at p. 1428 [facts comprised "the overall circumstances"].)

Defendant's actions resemble many of the actions deemed significant in these cases.  (See *Von Staden*, *supra*, 195 Cal.App.3d at p. 1425 [losing control and crashing car into telephone pole]; *McNiece*, *supra*, 181 Cal.App.3d at pp. 1053–1054 [driving 5-to-10 miles per hour over speed limit with .15

percent blood alcohol level]; *Stanley, supra*, 187 Cal.App.3d at p. 251 [driving three miles per hour over speed limit and "overcorrect[ing], sending the car into a skid"].) Sufficient evidence supports defendant's conviction.

## B.     Admissibility of Blood Evidence

Defendant next contends the admission of blood evidence violated his right to confront the witnesses against him under the Sixth Amendment.  We disagree.

### 1.     *Additional Background*

Prior to trial, defendant moved to exclude the results of his blood alcohol testing for lack of an adequate foundation.  He noted issues with the collection, storage, preservation, chain of custody, and use of established methods to handle the blood samples.  At a pretrial hearing, the court ruled that "each step is going to have to be established, chain of custody, through witnesses as well as the foundation before the court will allow any testimony" regarding actual testing results.  Following testimony by the hospital clinic director, defendant moved to strike the testimony for chain of custody issues and testing methodology.  The motion was denied.

### 2.     *Analysis*

The Attorney General contends defendant forfeited the confrontation clause argument, as he did not object to the

11

evidence on this basis at trial. We agree. (*People v. Redd* (2010) 48 Cal.4th 691, 730 (*Redd*).)[8]

Even if preserved, we reject the contention on the merits. The Sixth Amendment guarantees a criminal defendant "'the right . . . to be confronted with the witnesses against him.'" (*Crawford*, *supra*, 541 U.S. at pp. 38, 40, 42, 68–69.) Consistent with this right, "the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*People v. Lopez* (2012) 55 Cal.4th 569, 576 (*Lopez*).)

Following *Crawford* and its progeny, our state Supreme Court reexamined the meaning of "testimonial" statements in its own collection of cases. (E.g., *People v. Rutterschmidt* (2012) 55 Cal.4th 650; *Lopez*, *supra*, 55 Cal.4th 569; *People v. Dungo* (2012) 55 Cal.4th 608.) We agree with defendant that *Lopez* is helpful in guiding our analysis.

*Lopez* involved a vehicular manslaughter prosecution in which a criminalist (Willey) testified that a colleague from his lab (Peña) who did not testify analyzed a sample of defendant's blood

---

[8] In reply, defendant argues he preserved this contention by objecting on foundation grounds. This objection "presented legal issues different from those underlying an objection that the admission of testimony would violate the confrontation clause." (*Redd*, *supra*, 48 Cal.4th at p. 730, fn. 19.) The authorities defendant raises in reply do not persuade us otherwise. (See *People v. Williams* (2002) 28 Cal.4th 408, 414–417 [discussing foundational requirements for admission of breath test evidence]; *People v. Kocontes* (2022) 86 Cal.App.5th 787, 861–863 [defendant preserved foundation issue by interposing same objection and testimonial hearsay objection under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*)].)

and determined it had a .09 percent blood alcohol content. (*Lopez*, *supra*, 55 Cal.4th at p. 574.)  Willey was familiar with the procedures used by Peña and, "based on his own 'separate abilities as a criminal analyst,' he too concluded that the blood-alcohol concentration . . . was .09 percent."  (*Ibid.*)  Over defense objection, Peña's report and Willey's testimony was admitted into evidence.  (*Ibid.*)

The Court in *Lopez* distilled "two critical components" establishing testimonial statements. (*Lopez*, *supra*, 55 Cal.4th at p. 581.)  "First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (*Ibid.*)  Second, the statement's "primary purpose [must] pertain[ ] in some fashion to a criminal prosecution, . . ."  (*Id.* at p. 582.)  Applying these components to the facts, the Court found Peña's report was not made with "the requisite degree of formality or solemnity to be considered testimonial [citation]." (*Ibid.*)  Peña had not signed, certified, or sworn to the truth of the contents appearing in the report.  (*Id.* at p. 584.)  Without any indicia of formality, the Court found no error in the admission of Peña's report or permitting "Willey to testify regarding it."  (*Id.* at p. 585.)

The blood evidence defendant challenges in this case appears in his medical records.  The records reflect the results of automated testing done on all trauma patients and include a testing date and laboratory number.  The records were not created at the behest of law enforcement and lack the formality or solemnity indicative of testimony.  (See *Lopez*, *supra*, 55 Cal.4th at pp. 581–585 [medical records were "nothing more than an informal record of data for internal purposes"]; *Bullcoming v. New Mexico* (2011) 564 U.S. 647, 663–665; *Melendez-Diaz v.*

*Massachusetts* (2009) 557 U.S. 305, 310–311 (*Melendez-Diaz*).)
The primary purpose of defendant's hospital records was not for
criminal prosecution, but for treatment. (See *Melendez-Diaz*,
*supra*, 557 U.S. at p. 312, fn. 2 ["medical reports created for
treatment purposes" are not testimonial].) We thus discern no
error in the admission of this evidence.

## C.    **Exclusion of Defense Witness**

Defendant contends the court erred by excluding Pedro
Ramirez from testifying about witnessing the crash and seeing "a
person named [Ms.] Amezcua attempt a U-turn in front of
another vehicle, causing a crash." As defendant did not proffer
this testimony below,[9] he has forfeited this contention on appeal.
(*People v. Peoples* (2016) 62 Cal.4th 718, 744; *People v. Wallace*
(2008) 44 Cal.4th 1032, 1059.)

Defendant argues his counsel "did not or could not" offer
this testimony given an "unclear" pretrial ruling regarding
Amezcua. We disagree.

During a pretrial hearing on motions to exclude evidence,
the court questioned: "How can you completely keep out
percipient names of [ ] witnesses to the event? If there is another

---

[9]    Defendant identifies no portion of the trial record in which he
attempted to introduce Pedro Ramirez as a witness. Our own review of
the record reveals the following stipulation made at the preliminary
hearing: "Pedro Ramirez[ ] was at scene the day of the collision.
Ramirez advised that he was parked behind Amezcua. He advised
that he saw Amezcua attempt to make a U-turn in front of vehicle 2
and saw vehicle 2 lose control and crash. He saw Amezcua get out of
the vehicle and say that she was the other car involved."

car involved, it's part of the facts of the case." In response, the prosecution clarified it was not seeking to exclude "the fact that there was another car involved" but rather the driver's identity and the decision not to proceed with criminal charges against her. The court replied: "In terms of if someone can testify to the identity of the other driver, the court would allow that. As far as some questioning regarding why another driver was not charged, that is not open for questioning." Before calling his traffic reconstructionist in defense, defense counsel informed the court he "wasn't planning" on eliciting evidence of Amezcua's name. The court agreed and stated, "that there was another car involved, that is already in the evidence before the jury."[10]

Defendant does not show how the trial court's ruling prevented him from offering Pedro Ramirez's testimony about Amezcua's U-turn. Defendant has forfeited his contention that the court erred by excluding Ramirez's supposed testimony. To the extent he purports to revive it based on ineffective assistance of counsel, he does so without any argument. (See *People v. Medina* (1995) 11 Cal.4th 694, 774 [without argument, "we have no practical basis for second-guessing" counsel's decision].)

---

[10] The other car's involvement was established by the testimony of Robby and Mosley-Mitchell. In closing argument, the prosecution recognized the "very, very" real possibility another car was involved. The prosecution argued, however, that "a sober person would have been able to perceive [it and] put on their brakes. But the defendant was not a sober driver. So instead he pulled his steering wheel wildly to the left and rolled his truck." The "U-turn was a substantial factor in this crash. . . . But so was the defendant." (See CALCRIM Nos. 240 [multiple causes], 620 [substantial factor causing death].)

15

**D. Arrangement of Jury Instructions and Verdict Forms**

Defendant contends the court erred by failing to provide verdict forms for vehicular manslaughter while intoxicated (§ 191.5, subd. (b)), a lesser-included offense of gross vehicular manslaughter (§ 191.5, subd. (a)), and by improperly presenting the related instruction to the jury. He admits the jury was instructed on this lesser offense but argues the court "functionally [took it] away" by placing the instruction at "the very end" of its instructions.

Defendant's argument is belied by the record. As defendant admits, the jury was instructed on gross vehicular manslaughter while intoxicated (CALCRIM No. 590), as well as three lesser-included offenses: (1) vehicular manslaughter while intoxicated; (2) gross vehicular manslaughter; and (3) misdemeanor vehicular manslaughter. (CALCRIM Nos. 591–593). These lesser-included instructions were given after the greater-offense instruction (CALCRIM No. 590) and three related instructions (CALCRIM No. 595 [speeding laws defined]; Veh. Code, §§ 27360 [child passenger restraint requirements], 22107 [turning movements and signaling]). They were not separated or given at the end of the instructions. Moreover, the jury was instructed on using verdict forms and deliberating "the order in which you consider the greater and lesser crimes and the relevant evidence." (CALCRIM No. 3518.) Those verdict forms, which do not appear in the clerk's transcript but do appear in the trial court file, include forms for the lesser-included offenses.

The authorities cited by defendant govern the duty to instruct the jury on lesser-included offenses. (E.g., *People v. Flood* (1998) 18 Cal.4th 470, 480; *People v. Eilers* (1991) 231 Cal.App.3d 288, 292–293.) They do not address how these

16

instructions are to be arranged, nor do they impose a duty to provide the jury with verdict forms for lesser-included offenses. "'It is axiomatic that cases are not authority for propositions not considered.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 684.)

## E. Ineffective Assistance Claims

Defendant raises more than five ineffective assistance of counsel claims. To establish such claims, defendant must demonstrate: (1) his trial counsel's representation fell below an objective standard of reasonableness; and (2) resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 693–694; *In re Marquez* (1992) 1 Cal.4th 584, 602–603.) "Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122 (*Thompson*).)

### 1. *Suppression Motions*

Defendant contends his counsel was ineffective because he failed to file a motion to suppress blood evidence for lack of probable cause (§ 1538.5, subd. (a)(1)(b)(iii)) and for spoliation and contamination issues (*California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*)). However, defendant does not establish that there was merit to any such motion. (See *People v. Caro* (2019) 7 Cal.5th 463, 489 (*Caro*) [ineffective assistance claim must be based on meritorious suppression motion].)

The record does not disclose a proper basis for filing a motion to suppress for want of probable cause. Admission of defendant's blood draw, which was done by a private hospital for medical purposes, did not depend on a showing of probable cause.

17

(See *Caro*, *supra*, 7 Cal.5th at p. 498 ["medical personnel acting independently of law enforcement directives" do not implicate constitutional rights]; *United States v. Wipf* (8th Cir. 2005) 397 F.3d 632, 636 [probable cause not required for blood draw by hospital staff].)  The government's subsequent involvement did not "retroactively transform the original intrusion into a governmental search."  (*United States v. Sherwin* (9th Cir. 1976) 539 F.2d 1, 6.)  Even assuming the government was required to establish probable cause, it met this burden when obtaining a search warrant for defendant's blood samples.  (See §§ 1523, 1525.)

Defendant has also failed to establish a *Trombetta* claim. "Law enforcement agencies must preserve evidence only if it possesses exculpatory value 'apparent before [it] was destroyed,' and not obtainable 'by other reasonably available means.' [Citations.]  The state's responsibility is further limited when the defendant challenges the failure to preserve evidence 'of which no more can be said than that it could have been subjected to tests' that might have helped the defense.  [Citation.]  In such a case, unless the defendant can show 'bad faith' by the police, failure to preserve 'potentially useful evidence' does not violate his due process rights."  (*People v. DePriest* (2007) 42 Cal.4th 1, 41–42.) Here, defendant only speculates that additional testing might have revealed a lower blood alcohol content and suggests the police negligently handled the blood vials.  He does not show bad faith.  His arguments are insufficient to establish a *Trombetta* claim.  (See *People v. Flores* (2020) 9 Cal.5th 371, 394; *People v. Cook* (2007) 40 Cal.4th 1334, 1348; *People v. Carter* (2005) 36 Cal.4th 1215, 1246.)

18

### 2. *Motion to Dismiss*

"For the same reasons as stated in the above section," defendant contends his counsel was ineffective by not filing a motion to dismiss the information.  (See § 995, subd. (a)(2)(B); *Brewer v. Superior Court* (2017) 16 Cal.App.5th 1019, 1023.)  As stated above, we disagree.  Defendant has not established merit to any motion to dismiss based on the collection and handling of blood evidence.

### 3. *Cross-Examination of Kramer-Sarrett*

Defendant contends his counsel was ineffective by failing to cross-examine Kramer-Sarrett "about the labeling, identification, and handling of the blood sample" she tested.  The Attorney General contends, and we agree, this ineffective assistance claim is forfeited for the absence of reasoned legal analysis and citation to any legal authority.  (*People v. Davis* (2022) 75 Cal.App.5th 694, 721 (*Davis*).)

On the merits, the topics defendant identifies *were* addressed by defense counsel's cross-examination of Kramer-Sarrett.  That defendant "simply doubts the jury appreciated the significance" of that cross-examination does not establish ineffective assistance.  (See *People v. Williams* (2013) 218 Cal.App.4th 1038, 1075 ["There was no reason for defense counsel to make a duplicative effort in that regard"].)

### 4. *Additional Witnesses*

Defendant next contends his counsel should have called (1) Pedro Ramirez to further support his sudden emergency defense and (2) Christopher Stellern, a paramedic who responded to the scene of the accident, to rebut the charge of child abuse

19

against Jayda.  As before, defendant raises this argument without any analysis or authority.  (See *Davis*, *supra*, 75 Cal.App.5th at p. 721.)

The record sheds no light on counsel's decision not to call these witnesses.  We do not know if the witnesses might have provided hostile, unhelpful, or worse, incriminating testimony against defendant.  (See *People v. Samayoa* (1997) 15 Cal.4th 795, 845.)  Defendant only speculates the jury "would have likely believed" his defenses if these witnesses testified.  We cannot evaluate ineffective assistance claims from speculation.  (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

5.      *Medical Records and Prior Criminal Records*

Finally, defendant contends trial counsel was ineffective for refusing to challenge the admissibility of his medical and prior criminal records.  Defendant has forfeited this claim (see *Davis*, *supra*, 75 Cal.App.5th at p. 721) and failed to establish ineffective representation.  (See *People v. Williams* (1988) 44 Cal.3d 883, 936; see also *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060–1061 [counsel "may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence"].)

At trial, defense counsel stipulated defendant's medical records reflected "a true and accurate portion of the records" provided by the hospital.  This stipulation did not establish, as contended by defendant, the validity of any information appearing in those records.  As discussed, counsel challenged that information at trial.

As to the admission of a certified prior convictions packet (§ 969b), certified California Law Enforcement Telecommunications System (CLETS) sheet, amended felony

complaint, and certified transcript of plea proceedings to prove defendant's nine prior robbery convictions at a bifurcated proceeding, these documents are generally admissible as evidence of prior convictions. (See *People v. Delgado* (2008) 43 Cal.4th 1059, 1071–1072, fns. 5, 6; *People v. Martinez* (2000) 22 Cal.4th 106, 116, *People v. Ruiz* (1999) 69 Cal.App.4th 1085, 1090; *People v. Sohal* (1997) 53 Cal.App.4th 911, 913, 916.) As such, defense counsel was not ineffective in failing to object. (See *Thompson*, *supra*, 49 Cal.4th at p. 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, Acting P. J.

We concur:

TAMZARIAN, J.

VAN ROOYEN, J. **

---

** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.